Leslie L. Drummond

*v.*

Cook Motor Lines, *et al.*

(No. 10341)

Submitted September 12, 1951. Decided November 6, 1951.

*Robinson & Stump* and *John S. Stump, Jr.,* for plaintiffs in error.

*Clifford, Jones & White, J. Phillip Clifford,* for defendant in error.

Fox, President:

On January 22, 1949, the plaintiff, Leslie L. Drummond, fifty-one years of age, suffered serious injuries when the automobile in which he was a passenger was struck by a truck owned by the defendant, Cook Motor Lines, a corporation, and operated by the defendant, Wilbur W. Espy, on a public street in the City of Clarksburg. He instituted

his action in the Circuit Court of Harrison County against both said defendants. The trial of the case began on September 27, 1949, and was concluded the next day, resulting in a verdict for the plaintiff against both the defendants in the sum of $8,956.00. A motion made by the defendants to set aside the verdict being overruled, judgment was entered on the verdict on March 4, 1950, and this writ of error to the said judgment was granted on November 20, 1950.

The liability of the defendants to the plaintiff is not in issue on this writ, but a clear understanding of the case requires a brief statement of the circumstances surrounding the accident, and the nature of the injuries sustained by the plaintiff. Plaintiff was employed as an office manager by the D. E. McNicol Pottery Company operating in Clarksburg, and was using his wife's automobile to transport himself and a friend to their place of work. At the time of the accident, the automobile was being driven by Charles W. Booth, who was an employee of the McNicol Company. While passing along a street, they observed two young ladies, who were likewise employees of the McNicol Company, and they were offered a ride in the automobile. While they were approaching the automobile, and while the plaintiff was arranging the back seat for their use, being partly in the automobile and partly out, the automobile was struck by a truck driven by the defendant Espy, the effect of which was to drive the automobile forward quite a distance and cause injuries to the plaintiff. The following statement, as to just how the accident occurred, is taken from testimony of the plaintiff:

"I came in from Maple Lake on East Pike Street to Oak Street, and I turned out Oak to Jackson Street to Mr. Booth's home, and Mr. Booth took the car, was driving the car at that point, and we drove down one block this side of Oak Street, came across Pike and Meigs Avenue into Main Street and turned back east on Main headed towards Norwood, and just about the corner of Elm Street or this side of it we stopped to pick up two lady passengers that worked in the office."

When asked if there was any traffic behind him at that time, he replied: "There was no traffic that I knew of." He then said:

> "After the car stopped—it was a two-door sedan —I pulled up the seat I was sitting in, opened the door, turned around to remove some packages in the back on the seat so that these two ladies could be comfortable. At that time I had my left foot on the outside running board because I was turned around in the car."

When asked what then happened, he replied:

> "Well, I don't know whether I can or not. When I was moving the packages, something happened, and the next thing I remember I was being placed in the emergency car."

He stated that he had no knowledge of what happened, that he was unconscious for a time, but regained consciousness before he left the scene of the accident for St. Marys Hospital for emergency treatment. Plaintiff is corroborated in his statement by Booth and the two young ladies who were near the automobile at the time of the accident.

Plaintiff was taken to St. Marys Hospital immediately and Dr. D. H. Lough was called. Dr. Lough testifies as a witness and says:

> "I saw Mr. Drummond first about nine o'clock on the morning of January 22 in the emergency room of St. Marys Hospital. At that time the examination revealed severe abrasions, contusions, which means bruising and scraping, and laceration or cutting of the left ankle, left foot, and lower leg. He also showed on examination an abrasion or scraping of the head and nose. He had a nose bleed at this time, moderate, and complained at this also of pain in the back of the neck and shoulders. I had an X-ray taken of the left tibia and fibia by Dr. Wilson of St. Marys Hospital at that time which revealed no evidence of fracture. I gave him first-aid treatment, dressings on the leg and face and head and discharged him from the hospital emergency room. He was under

my care at frequent intervals or at least every forty-eight hours. * * * He was under my active treatment from the date of injury January 22 until March 3, 1949, during which time I saw him at intervals of two to three days.

"The day following injury, in my office, the 23rd, I X-rayed his cervical spine. He complained still of the back of the neck and shoulders, and this X-ray showed no evidence of fracture. The diagnosis at this time was, of course, the abrasions and contusions of the left ankle and left foot and lower left, with ligaments sprained of the left ankle. He also had some strain of the muscles and ligaments of the neck and shoulder, X-ray, of course, ruling out injury to the bone.

"On or about February 10—from the 10th to the 25th, approximately—I sent him to the Physiotherapy Department of St. Marys Hospital for treatment of the ligament and muscle soreness of the neck. That is the application of head and *message* under physiotherapy.

"About March 3 I discontinued active treatment of the abrasions and contusions of the ankle, which had practically healed.

"He had considerable difficulty in walking for a period of approximately a month or six weeks due to the ankle injury. That was apparently cleared up pretty well.

"Since March 3 I have not actively treated Mr. Drummond as far as treatments of his injuries go, but I have been in contact with his condition and advised him perhaps by telephone or when he accompanied his wife to my office, who is also under my care."

He also testified that the injuries left a scar on the anterior surface of the left lower leg just above the ankle; that at first he used crutches, and then used a cane; and that he used some form of aid in walking for a period of six weeks, after which he had a visible limp for two or three weeks. He says Drummond still complains of his shoulder and neck, and particularly on active motion and on change of weather. When asked whether

the discomfort or pain of the neck and shoulders was permanent in an intermittent way, he replied:

> "I wouldn't be able to judge that at the present time. The facts substantiating that statement would be the fact that he still has pain to this date. Beyond that I can't make any predictions."

When asked whether the injury to the ligaments of the neck or shoulders did not leave a weakened condition which, at his age, would render him more susceptible to arthritis, he replied:

> "In answering that I must qualify my statements to a certain extent. I'm not here as an expert witness under these conditions. I will answer the question in this way: We have found that injuries which patients may suffer may be one year, five years or so old; that if at any time in the future they become subjects of arthritis, they may suffer traumatic arthritis, or that resulting from trauma. They possibly could be predisposed to something like that."

He testified that at first the injury was quite painful, and required the use of opiates, and the leg was quite swollen. He also testified that the amount of his charges for treatment was $150.00. On cross examination, when asked if he undertook to tell the jury that the plaintiff, in his opinion, would have arthritis as a result of these injuries, he replied in the negative, and stated that a person of the age of plaintiff, fifty-one, might have arthritis at any time, and that no one knew the causes for such ailment.

We have quoted at some length from the testimony of Dr. Lough. That testimony is corroborated by that of the plaintiff in reference to his injuries. When asked how his injuries affected him in regard to pain, nerves and ability to sleep, plaintiff testified:

> "Well, for a period of time I couldn't sleep or go to sleep without some medicine the doctor gave me. That wore off gradually, and then for a greater period of time I had trouble going to sleep and would wake up during the night and

> probably couldn't go back to sleep. Sometimes now I still have that nervous condition and cannot sleep well."

He testified that he was in good health immediately prior to his injuries, had no particular pains or aches, and slept well. When asked if he was then free from pain as a result of these injuries, he replied: "Most of the time I am. Occasionally I am bothered. * * * In my neck and shoulders." When asked how his ankle injury had recovered, he replied:. "It hasn't pained me for several months now." He then made a statement as to the scar on his ankle which scar was exhibited to the jury. We are impressed with the fairness of the plaintiff and his physician in their testimony as to the injuries sustained by the plaintiff. There was apparently no attempt to exaggerate these injuries. It is manifest, of course, that the injuries sustained would for a time cause pain and suffering; but, except for occasional pain in the neck and shoulders, his suffering seems to have disappeared, and did disappear approximately six weeks after the accident.

It is claimed by plaintiffs in error that the verdict of the jury is plainly excessive, and, in connection with that claim, they urged that certain matters ought not to have been permitted to be considered by the jury, particularly the evidence touching the earning capacity of the plaintiff. We see no objection to the jury being informed of the earning capacity of the plaintiff, and we think the trial court committed no error when they permitted a showing that the plaintiff had, for the year 1948, earned the sum of $5,426.25, of which amount the sum of $3,-035.00 was from salary as an employee of the McNicol Company. The record shows that this salary was approximately $250.00 per month, and that it was paid to the plaintiff for January and February, 1949. The record also shows that on March 1, 1949, the McNicol Company dispensed with the services of plaintiff, and wrote him a letter which reads as follows:

> "We regret very much that, due to present conditions, we find it necessary to advise you that

we no longer are in need of your services. We thank you very much for the services that you have given us and only regret that we cannot continue to keep you on our staff.

"Enclosed you will find a check covering your past two weeks salary."

The claim of plaintiff is that he lost his position with the McNicol Company by reason of his inability, on account of his injuries, to take care of his work, and the uncertainty as to when he would return thereto, and the letter quoted is asserted as supporting that proposition. When asked as a witness the reason for his being dismissed by the McNicol Company, he replied, in the presence of the jury: "I believe it was for the reason that I was unable to tell them when I could go back to work full time." The jury was properly instructed to disregard this statement. So, there is, in fact, nothing in the record from which a jury should be permitted to say that he was discharged from his work by the McNicol Company because of this accident. At the end of plaintiff's evidence, a motion was made by the defendants that the jury be instructed to give no consideration to the evidence relating to the termination of plaintiff's employment with the McNicol Company, and give such evidence no consideration as an element of damage if they should find for the plaintiff. This motion was overruled, and in this we think the court erred. There was not, in our opinion, sufficient evidence introduced on this point on which the jury should have been permitted to assess damages on the theory that plaintiff had lost his employment with the McNicol Company by reason of his injuries. If such was a fact, there was no evidence that the officials of the McNicol Company were not available to establish that fact, and, of course, the plaintiff's opinion thereon is of no value as evidence. The jury should have been instructed not to consider that element of the case.

Another question arises in respect to instructions which have a bearing upon the amount of the verdict. Plaintiff requested the court to give two instructions, both of

which were objected to at the time on specific grounds. We find no fault with Instruction No. 1. Instruction No. 2 reads as follows:

"The Court instructs the jury that if you find for the plaintiff, in estimating the damages, you are at liberty to consider the health, condition and earning capacity of the plaintiff before the injury, as compared with the present condition; also the extent of said injury and its nature, *and how far it is calculated to disable the plaintiff from engaging in those pursuits and occupations for which, in the absence of said injury, he would have been qualified;* also the physical suffering to which he was subjected by reason of said injury; *also any losses that may occur in the future to the plaintiff, provided they are such as the jury believe from the evidence will actually result to the plaintiff as the proximate damages of the wrongful acts complained of;* also all necessary and legitimate expenses incurred by the plaintiff because of said injury; and to allow such damages as in the opinion of the jury will be a fair and just pecuniary compensation for the injuries which the plaintiff has sustained." (Emphasis ours.)

We think the court committed error in giving the underscored portion of the above quoted instruction. There was, in our opinion, no evidence in the case showing that the plaintiff would be disabled from engaging in an occupation for which, in the absence of such injury, he would have been qualified; nor that any losses would occur to him in the future from such injuries. As we understand the record, it shows that after six or seven weeks following the accident, plaintiff has been fully capable of following his usual work. The only danger of future suffering grows out of the possibility that plaintiff occasionally may have pain in the neck and shoulders, might develop arthritis, and that the injury in the neck and shoulders might cause that disease to affect him at those points of his anatomy. As is well known, we cannot permit juries to return verdicts on possibilities or

conjecture of that nature. We are of the opinion that giving this instruction was reversible error.

Aside from all these matters, we think the verdict is plainly excessive. There is no sufficient evidence in the case on which the jury could have found any damages on account of plaintiff's dismissal as an employee of the McNicol Company. He may have lost his position by reason of this accident, but if that be a fact, the evidence is not sufficient to establish it, and the court should have so instructed the jury when requested to do so. Assuming liability of the defendants, a question we do not decide because not here involved, plaintiff was entitled to recover his costs of medical treatment, and for his pain and suffering. The testimony of the plaintiff and his physician as well is to the effect that that pain and suffering did not exist for more than six or seven weeks, other than occasional pain in the neck and shoulders. The jury had the right to take this into consideration and evidently did so; but the amount of the verdict is out of all proportion to any sum which the jury might have properly found for the injuries sustained. That they were painful for the period of six or seven weeks, we do not question; but aside from the condition of the neck and shoulders, which may possibly affect his future comfort, and aside from the small scar on his left ankle, plaintiff has suffered no permanent injury.

Courts are loath to interfere with the verdict of a jury on damages in personal injury cases, because of the many possibilities and probabilities arising from such injuries. It has long been established that such interference will not be made except in cases where the verdict is so excessive as to indicate passion, prejudice, partiality, mistake or lack of due consideration. On the other hand, it is established law in this State, as held in *Thomas* v. *Lupis,* 87 W. Va. 772, 106 S. E. 78, that:

> "A verdict for damages for personal injury, based upon evidence not sufficient to show with reasonable certainty the extent or permanency of the injury, and so excessive as to indicate pas-

> sion, prejudice, partiality, mistake, or lack of due consideration, should be set aside upon motion for a new trial."

See also *Chafin, Adm'x.* v. *Norfolk & Western Railway Co.,* 80 W. Va. 703, 93 S. E. 822; *Welty, et al.* v. *Baer, etc., et al.,* 107 W. Va. 226, 148 S. E. 193; *Snodgrass* v. *Charleston NuGrape Company,* 113 W. Va. 748, 169 S. E. 406; *Thomason, et al.* v. *Mosrie,* 134 W. Va. 634, 60 S. E. 2d 699.

There is nothing in this case to indicate clearly upon what basis the jury returned its verdict. There is nothing to indicate passion or prejudice, and we can only conclude that the jury has taken a mistaken view of how far they could go in compensating the plaintiff for the loss of his position with the McNicol Company. There is nothing in the case indicating that it is based upon any thought of punitive action, nor does the declaration or proof furnish any grounds for punitive action; none is alleged, and plaintiff's instructions do not call for that character of verdict. Apparently it is just a case where the jury was carried away by some character of emotion which led them to return a verdict far beyond that which the nature of the case warranted. Apparently they took an entirely mistaken view of the case.

We, therefore, reverse the judgment of the Circuit Court of Harrison County, entered on the 4th day of March, 1950, set aside the verdict on which the said judgment was based, and remand the case for a new trial.

*Reversed and remanded.*