JAMES HENRY NUGEN, *an infant, etc.*, WHO SUES BY FANNIE NUGEN, HIS NEXT FRIEND

*v.*

GERALD H. HILDEBRAND

(No. 11081)

Submitted May 3, 1960.          Decided July 6, 1960.

*Carl B. Vickers, Fletcher W. Mann,* for plaintiff in error.

*Laird, Thrift & Hamilton, Pat R. Hamilton,* for defendant in error.

BROWNING, PRESIDENT:

This is an action of trespass on the case for personal injuries sustained by James H. Nugen, plaintiff, when he fell while water skiing and was struck by the propeller of a boat owned and operated by the defendant, Gerald H. Hildebrand. The action was originally intituted by plaintiff as a minor by his next friend, but was subsequently changed, by order of the court entered November 10, 1958, plaintiff's majority being suggested, to an action in his own proper person. The case was tried to a jury, the jury returned a verdict in favor of the plaintiff and against the defendant in the amount of $50,000.00, and the judgment was entered thereon, to which judgment this Court granted a writ of error and supersedeas on September 14, 1959.

The accident occurred on July 4, 1957, at a place locally referred to as the ''pond'' on New River, a short distance above the Town of Gauley Bridge in Fayette County, West Virginia. The ''pond'' was a gathering place for boating and water skiing enthusiasts in that area, and on the day of the accident there were 10 to 20 motorboats in the water and 75 to 100 picnickers and spectators present. At the time of the accident, however, there were but 3 boats out on the ''pond'': One, operated by Charles Witt, across the river from the dock area; two, the motorboat towing the plaintiff, operated by Ray Foose; and three, the motorboat operated by the defendant. The motorboats of Foose and the defendant were of similar design and length, powered by 25 horsepower outboard motors and capable of speeds up to 22 or 25 miles an hour. Plaintiff, 19 years of age, had never attempted to water ski before the day of the accident, but, acceding to the urging of his friends, consented to try. In common with all beginners, he fell several times, the evidence showing 6 to 8 falls, before he managed to maintain himself and his water skis on top of the water. The evidence is conflicting as to whether a complete circle of the pond with any degree of success

was accomplished before the accident. Nevertheless, the plaintiff managed to maintain himself upright and the boat towing him, by means of a rope 75 feet in length, proceeded down the river under full throttle, angling slightly toward the right bank of the river, the bank on which the dock was situated. Within minutes after the towing boat and plaintiff had disappeared from view at the dock, defendant and one Johnson entered defendant's boat and proceeded down the river on a course parallel to the right bank. No one observed the boat of the defendant actually strike the plaintiff. Foose and Brown, in the towing boat, stated that they observed the defendant's boat when it was approximately 200 feet to the rear of their boat and some 40 to 60 feet to the right; that they then looked away as Foose turned his boat to the left; noted from the performance of the boat that the plaintiff had fallen; and returned to pick him up, at which time they discovered that he had been injured.

Plaintiff testified that he observed the defendant's motorboat 25 to 35 feet to his right and called to the defendant to get the boat away from him. He then turned his head to the front and, as the towing boat started to turn, his feet "flew out from under me" and "I hit the water and stopped within six or eight inches." In answer to a question as to what happened then, plaintiff answered: "Well, I don't even remember straightening up in the water. It just seemed like I hit, and I felt the awfullest lick in the back I ever did see." Charles Witt, who was operating a motorboat on the other side of the river from the dock, and had observed the boat towing the plaintiff and the boat of the defendant prior to the accident, stated that defendant's boat was then 20 to 30 feet to the right of the boat towing the plaintiff and approximately 100 feet distant therefrom. This witness also stated, in answer to a question as to a conversation that transpired following the accident: "Well, they was discussing about if he hadn't cut sharp and Gerald [the defendant] and all of them was just agreeing what

it done—when Gerald cut sharp, and he was agreeing that when he cut short is what run the boat into Jim.'' Another witness, Sonny Ellison, in answer to a question as to whether defendant had made any statement as to how the accident occurred, testified: ''Yes, Gerald said—we was standing there on the side—and Gerald said he was going down the river, straight down the right side of the river, started to make a curve, just a slight curve, and when he started to turn around Jimmie fell off the skis and he was so close (that when) he turned the front of his boat around and the back of it caught him.'' Defendant denies making any such statements.

For the defendant, Johnson, the passenger in defendant's boat, testified: That defendant's boat was proceeding down the river parallel to the right bank; that the Foose boat, towing the plaintiff, had angled in toward the right bank, then straightened out and the boats were pursuing parallel courses, the boat of the defendant being 20 feet to the rear of the plaintiff and 30 to 40 feet to his right; that Foose made a sharp turn to the left and defendant turned sharply to the right, throwing him out of the boat into the water, and stopped his motor; that when he came up from beneath the water, plaintiff was crying: ''Oh, my back.'', and, that he was then slightly down river and to plaintiff's *left* and defendant's boat was stopped down river and to plaintiff's *right*. Defendant testified as to the angling in of the Foose boat, the subsequent paralleling of courses and that, immediately prior to the accident, his boat was approximately two boat lengths (28 feet) to the rear of plaintiff and 40 to 50 feet to his right. He stated that Foose cut sharply to the left throwing the plaintiff to the right and in front of his boat; that he turned his boat as sharply to the right as he could, throwing Johnson out, and stopped his motor; and that when plaintiff fell, he went under water and he did not see him again until after his boat had stopped.

Plaintiff suffered severe lacerations to his lower back and buttocks, shaving off bony portions of his

fifth lumbar vertebra and hipbone, and severing most of the sacral nerves on the right side of his body. The severed nerves control the bowels, urinary bladder, and innervate the skin and muscles in certain areas in the central portion of the body, and portions of the right thigh, calf and foot. He was hospitalized from July 4, 1957 to July 31, 1957, when he was released, returning weekly as an outpatient until September 1, 1957, when he was again hospitalized for the purpose of an operation to remove a stone or stones from his bladder, being released on September 27, 1957. During this period, he incurred medical expenses of approximately $1,000. Plaintiff returned to work as an automobile salesman in October, 1957, and has been gainfully employed since that time. At the time of the trial, he was experiencing some rectal and urinary incontinence; numbness in his buttocks, thigh, leg, foot and genital area; and, atrophy of his right leg. The prognosis is that he is much more susceptible to bladder infection, with possible involvement of the kidneys, than the ordinary individual.

Upon this writ of error, the defendant relies for reversal upon these alleged errors: (1) The evidence fails to establish primary negligence as a matter of law; (2) plaintiff was guilty of contributory negligence as a matter of law; (3) plaintiff is barred from recovery as a matter of law by virtue of assuming the risk which resulted in his injury; (4) the proximate cause of plaintiff's injury was the negligent operation of the Foose boat; (5) the introduction in evidence, over objection, as an element of damages, of plaintiff's loss of earnings, medical and hospital expenses, the plaintiff being at that time an infant; (6) the excessiveness of the jury verdict; and (7) the giving and refusing of instructions. These assignments of error will be discussed, but not necessarily in that order.

The Legislature of this State has enacted detailed legislation regulating the operation of motor vehicles upon public highways, Chapter 17C of the Code, as amended. There is no similar legislation regulating

the operation of pleasure craft upon public streams. We are cited to no former decision of this Court, nor do we find any relative to that question. However, elsewhere, there is authority. 65 A.L.R., Section 34; 11 C.J.S., Collisions, Section 107; and 48 Am. Jur., Shipping, Page 360. Some of the cases therein cited involved injuries to swimmers, or others, by the operators of motorboats. Even if there were no precedents, the fundamental common law tort principles would be applicable. The declaration in this case correctly alleges that defendant owed to the plaintiff a duty of due care, and it is the view of this Court from the evidence, some of which has been stated hereinbefore, that a jury question was presented as to whether that duty was violated.

This case is easily distinguished upon the facts from *Adams v. Ferrell, et al.,* 135 W. Va. 463, 63 S. E. 2d. 840, in which this Court held that, while a person may approach a dangerous situation without being negligent, he may become negligent by remaining in a particular position and by so doing expose himself to an apparent or subsequent peril. This plaintiff at the time of his injury was not in a position to extricate himself from the hazard of being struck by a boat approaching from his rear and, if he continued the sport in which he was engaged, he had no choice but to cling to the rope attached to the boat which was pulling him. At best, it was a jury question as to whether he was guilty of any act of negligence that contributed proximately to his injury. If any negligence could be attributed to Foose, in turning his boat to the left under the circumstances then prevailing, that would not relieve the defendant of his negligence, and if the plaintiff's injury was due to the concurring negligence of Foose and the defendant that would be no defense to the latter.

It is true, as contended by the defendant, that the rule of assumption of risk has been recognized and applied in a long line of decisions by this Court. Although the plaintiff was guilty of no negligence, he

would be barred from recovery if he had voluntarily assumed the risk of a known hazard and his injury resulted therefrom. *Matthews v. Gas Co.,* 138 W. Va. 639, 77 S. E. 2d. 180, and many cases cited in the opinion of that case. The plaintiff in this case may have assumed the normal risk incident to skiing on the water behind the Foose boat, but he did not assume the risk of an independent act of negligence by the defendant. See: *Wright v. Valan,* 130 W. Va. 466, 43 S. E. 2d. 364; *Hunn v. Hotel Co.,* 119 W. Va. 215, 193 S. E. 57; 38 Am. Jur., Negligence, §173.

This plaintiff, at the time of his injury, and during the period when he incurred medical and hospital expenses, as well as during the period he was disabled from employment, was under the age of twenty-one years. However, prior to his injury, he had been employed at the same occupation which he resumed after his partial recovery, and his father was at that time deceased. At the time of the trial, the plaintiff was of age. Upon the question of whether he was entitled to prove and recover for medical and hospital expenses and loss of earnings, *Grim v. Moore,* 121 W. Va. 299, 3 S. E. 2d. 448, is controlling. The 2nd. Syllabus Point reads: ''While the rule is established that a father is primarily responsible for expenses incurred in the treatment of his injured infant, yet when the father is dead, leaving no estate, the rule can have no application. In such case the infant himself is liable for the expenses, and may recover them from the person causing the injury, if it was tortious.''

This is a large verdict, particularly in view of the comparatively small amount of wages lost, and the relatively small medical and hospital bills proved by the plaintiff. This Court has carefully considered the assignment of error as to the excessiveness of the verdict and in so doing has studied the testimony of Doctors Milam and Aguilar who testified for the plaintiff, and Doctor Ralston who testified in behalf of the defendant. The loss of sensation, or numbness, in the buttocks and sacral area of the plaintiff's body, which also affected one of his legs, resulting from the severe

damage to the sacral nerves and producing the incontinence which has been heretofore described, was shown by the medical evidence to be of a permanent nature. This testimony meets the test of reasonable certainty which is required in such cases. The statute law of this State imposes no limitation on the amount recoverable in a personal injury action, although there is a limitation if the injury is fatal. No attempt will be made here to review all of the decisions of this Court relating to the excessiveness of jury verdicts. Suffice to say that the rule seems firmly established that the verdict of a jury in such a case, approved by the trial court, will not be disturbed by this Court if the damages are reasonably compensatory and not such as to show partiality, prejudice, or misconduct on the part of the jury. See: "Reversal and Retrial Exclusively on the Quantum of Damages.", 25 West Virginia Law Quarterly, 131.

In view of the severe injury which this plaintiff received, and the pain, suffering and discomfort, which the medical evidence shows with reasonable certainty that this young man will experience for the remainder of his life, this Court will not as a matter of law substitute its judgment for that of the jury and trial court, and hold that the verdict is excessive.

For the reasons heretofore stated, the Court finds no error and the judgment of the Circuit Court of Fayette County is affirmed.

*Affirmed.*