CLEMA WILLIAMS

*v.*

PENN LINE SERVICE, INC., A CORP., *et al.*

(No. 12149)

Submitted May 15, 1962.          Decided July 3, 1962.

CALHOUN, PRESIDENT, dissenting.

*Breckinridge & Brown, Benjamin P. Brown, Jr., Steptoe & Johnson, Stanley C. Morris,* for appellants.

*Ernest V. Morton, Jr., Brooks B. Callaghan,* for appellee.

BROWNING, JUDGE:

Plaintiff, Clema Williams, instituted this civil action in the Circuit Court of Webster County to recover damages for personal injuries sustained when she was struck by a truck owned by the corporate defendant, Penn Line Service, Inc., hereinafter sometimes referred to as Penn, and driven by the individual defendant, Herbert Ware. The jury returned a verdict in favor of the plaintiff and against both defendants in the amount of $100,000.00 and judgment was entered thereon. Defendants thereafter moved to set aside the judgment and award them a new trial which motion was overruled on November 27, 1961, to which judgment this Court granted an appeal and supersedeas on December 11, 1961.

The accident occurred at approximately 11:00 A.M. on April 1, 1960, on State Route 20 on what is known as Baker's Island in the town of Webster Springs. Plaintiff, in testifying, stated that: she had emerged from a building on the west side of the highway, waited for traffic to pass, then walked to the end of the building and crossed the highway to the opposite berm; and she then began walking north along the berm until she heard a noise behind her, looked back and saw defendants' truck but so close she could not avoid being struck. She also stated that "As I come out of the building I noticed this red truck and it looked like it was getting ready to go toward Cowen [south]. I thought it

went that way." A statement taken from her in the hospital by a state trooper is as follow: "I had just come out of the power company and crossed the road and was on the dirt part. I saw the truck backing and I thought it was going to back out into the road. I started walking on toward Webster Springs. I turned and the truck was right on me. I tried my best to get out of the way. The rear of the truck is what knocked me down. The transmission hit me. I was under the truck near the middle when it stopped."

On the east side of the highway, where the accident occurred, was an unpaved berm at least twelve feet in width extending north in front of the office building of Penn, a barber shop and a vacant lot, used by Penn and its employees as a parking lot, which lot was enclosed by a post and cable fence with an opening for the ingress and egress of vehicles. An automobile was parked at an angle near the common corner of the barber shop and parking lot. The truck which struck the plaintiff was a red "pick-up" truck with the rear covered over with aluminum and with tool bins along the sides leaving a "tunnel" about 36 inches wide. It was equipped with side rear-view mirrors but the individual defendant, Ware, stated: ". . . the best view I could get was through the back." A similar truck, painted all red, arrived at the Penn office as Ware was leaving. Ware entered his truck ". . . looked out the back and started backing out and continued to back out with my arm on the back seat. I attempted to cut the truck between the 2 posts that held the wire in order to turn around. That is when I heard her scream." Ware further testified that he backed a distance of 51 feet before striking plaintiff. It was admitted by Ware, and plaintiff's witnesses also testified, that the berm where the accident occurred was commonly used by pedestrians as a walkway.

Plaintiff was taken to a hospital where she was found to be ". . . in severe shock; her pulse was very weak; her respiration was labored and weak and she was bleeding profusely from a deep tear or laceration in the perineum. In fact when I first saw her I did not think she would live any length of time. . . ." After initial treatment for shock

plaintiff's injuries were later determined to be: a laceration of the perineum, the area between the vagina and the rectum, 6 inches in length and from one to six inches in depth; both shoulder blades were broken; 8 ribs, Nos. 2 through 9 on the left side were fractured, most of them having more than one fracture, accompanied by severe internal bleeding into the chest cavity; her left clavicle or collar bone was fractured; one hand broken or sprained; and many other bruises and abrasions. She remained in the hospital 52 days during which time it was necessary to aspirate her chest cavity several times, that is, remove the accumulated blood or other fluid by means of a needle inserted into the area, the total amount removed being some 2,000 centimeters. It was also necessary to relieve her severe pain in breathing by injecting novacaine into the nerve of each fractured rib several times. Dr. James A. Walker, a thoracic surgeon, testified that: "In my opinion the multiple rib fractures are healed but the normal shape and action of the ribs are permanently impaired and I believe the motion of the left rib diaphram is permanently impaired and the expansion of the left lung is impaired permanently by the constrictive pleuritis." He described the "constrictive pleuritis" in this particular case as having the effect of a "binding membrane preventing the normal expansion of the left lung, the normal motion of the left diaphram and the normal motion of the left chest cage. This process has the resulting effect of preventing the normal flow of air in and out of the left lung." Dr. Walker further testified that: ". . . Based upon my physical findings, the patient's complaint and the chest observations and the pulmonary studies, I believe the function capacity of the left lung to breath is impaired about 50 per cent." On cross-examination Dr. Walker stated that while the left lung carries only about 45 per cent of the breathing ability of a person, of which plaintiff has lost 50 per cent, it is necessary "to have approximately 35 to 40 per cent of lung tissue to breath." Dr. Jack W. Hunter, plaintiff's attending physician, testified that: ". . . I examined her on May 16, and when I checked her she was unable to raise her arms above the level of her shoulders; any motion of the head or neck she complained of severe pain; she was very tender

when touched over the shoulder blades and I checked the perineum and it had healed but was very sensitive and the scar seemed to be red and irritated." He further testified that the plaintiff has neuritis, an injury to the nerves due to the pain and irritation suffered and has sustained a traumatic arthritis of both shoulders as a result of the injury, which will probably grow progessively worse. On cross-examination, Dr. Hunter testified that plaintiff had made a surprising recovery from her injuries and that, while he would not consider her a helpless person, she could not carry on her normal housework to the extent she formerly did. Dr. Edmiston testified that: plaintiff had sustained a neuritis and arthritis following the injury which is permanent and probably progessive; the fracture of the clavicle was of no great significance but "later on will develop a great traumatic arthritis and will limit the motion of the collar bone"; she will "maintain 90 degrees, which is the motion level with the shoulder. She will not have any shoulder motion that will permit her to reach over her head or any motion that would require lifting her arm above 90 degrees"; and, while her right shoulder blade has healed, it has healed abnormally with a dislocation of the lower portion. On cross-examination, Dr. Edmiston testified that he would assume plaintiff could do light housework which did not entail any heavy work or lifting or reaching over her head. Hospital and medical bills, exclusive of drugs since release from the hospital, amounted to $1,500.00.

Plaintiff, at the time of her injury, was 49 years of age and separated from her husband, whose whereabouts is unknown. She has two children, a boy and a girl, aged 14 and 16, respectively, residing with her. She was engaged in performing housework for other people, from which employment she averaged $60.00 a month, and during the month preceding her injury she had engaged in selling cosmetics in the Webster Springs area from which she earned commissions of $30.00. Since her injury, plaintiff states: she cannot dress herself due to pain which prevents her from raising her arms and from stooping over; she still has pain from the laceration in the perineum; she has difficulty in breathing and in walking uphill; she has pain in her chest, back

and shoulders; and, she is afraid of automobiles and traffic and afraid to go near a road or street unless accompanied by someone. She also testified that she does some housework such as sweeping and washing dishes but it is necessary for her to get on a chair to put dishes away when the cupboards are over her head. She testified that she is unable to iron, scrub floors, wash walls or work in a garden.

Twelve assignments of error are made in this Court, only one of which it is deemed necessary to discuss in arriving at our decision. Suffice to say, the Court finds no error in the giving or refusal of instructions, in the submission to, and the findings thereon, of the jury with regard to the questions of primary and contributory negligence; nor in the other assignments.

The question as to the excessiveness of the verdict is the only one that has given this Court any concern in reviewing this case. Since the decision of this Court in *Nadenbousch* v. *Sharer*, 4 W. Va. 203, decided at the January Term, 1870, this question has perplexed this and, of course, all other courts. In that case Judge Brown, commenting upon that question in a concurring opinion, said: "Upon the question of excessive damages, it may be remarked that, it must be a strong case to set aside a verdict for that cause, because it is the peculiar province of the jury to ascertain the amount of damages, and they are better able to judge of the circumstances of the case and the weight of testimony, and the credibility of witnesses, and the peculiar hardships and aggravations attendant upon the injury. . . ." In the case of *Unfried* v. *Balt. & O. R'd Co.*, 34 W. Va. 260, 12 S. E. 512, the trial court held that a verdict of the jury for the plaintiff in the sum of $7,000 was excessive and proposed a remittitur of the sum of $3,500, which the plaintiff elected to accept. This Court held that such procedure, under the decisions of this Court and the Virginia Court, was erroneous, the single syllabus point of that case stating: "In an action for damages, where the verdict of the jury is so erroneous as to clearly indicate prejudice, partiality, passion or corruption in arriving at their conclusions, the defendant on motion is entitled to a new trial; and it is error in the court to allow

the plaintiff to elect to take a less sum suggested by the court, when there are no *data* before the court, by which said smaller sum could be rightly and definitely ascertained, but which is fixed by the discretion of the court unaided by evidence." The first portion of this syllabus point represents the rule since followed by this Court in determining whether a verdict is excessive.

In the case of *Raines* v. *Faulkner*, 131 W. Va. 10, 48 S. E. 2d 393, a jury verdict approved by the trial court in the sum of $5,000, in an action by a young woman for an indecent assault, was set aside by this Court in a three to two decision. The Court stated: ". . . to justify a verdict of three thousand dollars for compensatory damages, based almost entirely on terror, mental anguish and humiliation, the jury must have concluded that plaintiff's terror, mental anguish and humiliation were very extensive and of considerable duration. The evidence does not support such conclusion. . . ." For the same reason and citing the *Raines* case, in another three to two decision in *French* v. *Sinkford*, 132 W. Va. 66, 54 S. E. 2d 38, a judgment upon a verdict in the sum of $10,000 for injury to a female child eleven years of age who was struck by a motor vehicle was reversed, the Court stating: "We have quoted this evidence of the only witnesses who were competent to pass upon the probable result of plaintiff's injuries. We conclude that these physicians did not believe that this child would suffer from any permanent disability on account of her injury. The case is one where there has been an injury of a nature from which complete recovery may be expected, and normal recovery is in progress, and according to the testimony the period of recovery need not exceed twelve months. . . . Naturally there was some pain and suffering, but four months after the date of the injury it had apparently disappeared, and there was nothing to anticipate it would recur. . . ."

No effort will be made to cite and analyze all of the cases upon this question, but a good discussion thereof is contained in the fairly recent case of *Yuncke* v. *Welker*, 128 W. Va. 299, 36 S. E. 2d 410, and many former decisions of this Court are therein cited. In the opinion of the *Yuncke* case it was

stated: "In an action to recover for personal injuries the damages are unliquidated and indeterminate in character, and the assessment of the amount is generally for the jury. . . . The only limitation which the law imposes is that the damages be fairly compensatory and not such as to show partiality, prejudice or misconduct upon the part of the jury. . . . In a personal injury case no rule of law fixes the measure of damages; the law leaves the amount of damages for tort to the sound discretion of the jury. . . . Though a court may set aside a verdict as excessive, its authority to do so may not be arbitrarily exercised. It is a general rule that where damages are indeterminate, mere difference of opinion between the court and the jury as to what the verdict should be, will not justify the court in disturbing the verdict. To warrant such action the verdict must evince passion, prejudice, partiality, or corruption on the part of the jury. . . ." In the very recent case of *Armstead* v. *Holbert,* 146 W. Va. 582, 122 S. E. 2d 43, this Court affirmed the Circuit Court of Kanawha County in reversing a judgment of the common pleas court of that county upon a jury verdict for the plaintiff in the sum of $65,000, this Court finding that error had been committed in the trial of the case as shown by the first two syllabus points. This statement is contained in the opinion of that case: "However, a majority of the Judges of this Court are in agreement with the circuit court that while '* * * the verdict was probably too large, * * *', it could not be said to be excessive as a matter of law and would not be set aside upon the ground of excessiveness alone." In the recent case of *Nugen* v. *Hildebrand,* 145 W. Va. 420, 114 S. E. 2d 896, this Court refused to set aside as excessive a verdict in favor of the plaintiff in the amount of $50,000.00. See also *Smith* v. *Penn Line Service, Inc.,* 145 W. Va. 1, 113 S. E. 2d 505, wherein, though reversing on other grounds, the Court refrained from making any critical comment as to the verdict in the amount of $85,000.00.

Counsel for the appellants rely principally upon the decision of this Court in *Brewer* v. *Appalachian Constructors, Inc.,* 138 W. Va. 437, 76 S. E. 2d 916. In that case judgment was entered upon a jury verdict for the plaintiff in the sum

of $93,800 and this Court set it aside as being excessive. The injuries which the plaintiff suffered are described in the opinion and it will not be necessary to repeat them here. The reasoning upon which the verdict was held to be excessive was based upon the assumption that this sum invested at 3% interest would return to the plaintiff an amount almost equal to his annual earning capacity during his life expectancy and that at the end thereof he would have the principal sum intact. It is stated in the opinion that the plaintiff has suffered and will suffer a loss of earning capacity of $69,703.70. The verdict of $93,800.00 plus the sum of $6,200 from the Workmen's Compensation Fund, is said in the opinion to be "tantamount to a verdict in the amount of $100,000". The Court further stated: "We are of opinion from this analysis of the instant verdict that it is clearly excessive and should be set aside on that ground. We say this because we think that the verdict, embracing as it does an element in the amount of more than thirty thousand dollars for pain, suffering and inconvenience, growing out of plaintiff's serious injuries, shows that the verdict is the result of mistake, partiality in favor of and sympathy for plaintiff, prejudice, or lack of due consideration, and should be set aside on this writ of error."

In *Corrick* v. *Western Maryland Railway Co.*, 79 W. Va. 592, 91 S. E. 458, the Court said: "There is no inflexible rule by which damages for personal injuries can be determined with mathematical precision, and the law entrusts the matter to the sound judgment of the jury." As will be observed from the cases heretofore cited, it is the peculiar and exclusive province of the jury to assess damages in a personal injury action, and the question of excessiveness must depend upon the facts in each particular case. It is therefore unfortunate that in the opinion in the *Brewer* case, in its reasoning to illustrate its conclusion that the verdict was the result of passion or prejudice, that the Court used a mathematical example to do so. In *Thompson* v. *Barnes*, 236 S. W. 2d 656, the Texas Court recognized the dilemma thus posed in upholding an $85,000 verdict for a back injury, stating that while the plaintiff "could never reasonably have hoped to amass through 20 years of honest, hard ap-

plication, $85,000," the verdict could not be disturbed as a matter of law in view of the showing in the record of "his physical pain, past and future, and his mental anguish, past and future".

"The damages from suffering, either mental or physical, cannot be weighed; it cannot be measured; it cannot be computed. It can only be estimated. The difficulty in making the estimate affords no good reason for failure to make it, . . . The estimation must depend upon the good sense, sound judgment, and enlightened conscience of the jury, under all the facts and circumstances of the particular case, and the sensibilities of the particular person." *Coombs* v. *King*, 107 Me. 376, 78 A. 468, Ann. Cas. 1912C, 1121. Of similar import is the case of *Eby* v. *Wilson*, 315 Mo. 1214, 289 S. W. 639, 50 A.L.R. 268, which contains this statement: "The reason for holding parties so tenaciously to the damages found by the jury in personal torts is that in cases of this class there is no scale by which the damages are to be graduated with certainty. They admit of no other test than the intelligence of a jury governed by a sense of justice."

It is clear from the decisions of this Court that in arriving at its verdict this jury had a right to consider not only the financial loss suffered and to be suffered by the plaintiff but physical and mental suffering prior to and subsequent to the trial as well as her "nervous" condition resulting from the injury.

The verdict in the instant case was approved by the trial judge who, as did the jury, saw and heard the witnesses testify and was better able than this Court to determine the actual damage to the plaintiff and this Court is unable upon the present record to say, as a matter of law, that the verdict is so excessive as to indicate passion, prejudice, parttiality or mistake, or lack of consideration on the part of the jury and the Court perceiving no other error, the judgment of the Circuit Court of Webster County is affirmed.

*Affirmed.*

CALHOUN, PRESIDENT, dissenting:

In 1960, this Court approved a verdict for $50,000 for personal injuries suffered by a young man nineteen years of

age. *Nugen* v. *Hildebrand,* 145 W. Va. 420, 114 S. E. 2d 896. It is my understanding that such was the largest verdict for personal injuries to a single individual ever to have been upheld by the Court to that date. Assuming that my understanding in this respect is correct, it must be regarded as a matter of more than passing moment that the Court in the present case has approved a verdict for personal injuries to a single individual which is 100% greater in amount than any heretofore upheld in a similar case.

"This Court will set aside a jury verdict as excessive which is so high that it plainly appears to have resulted from mistake, partiality, passion, prejudice or lack of due consideration." *Brewer* v. *Appalachian Constructors, Inc.,* 138 W. Va. 437, pt. 11 syl., 76 S. E. 2d 916; *Frampton* v. *Consolidated Bus Lines,* 134 W. Va. 815, pt. 6 syl., 62 S. E. 2d 126. "A verdict clearly in excess of the amount which the evidence shows the plaintiff is justly entitled to recover should be set aside by the trial court." *Thomason* v. *Mosrie,* 134 W. Va. 634, pt. 2 syl., 60 S. E. 2d 699; *Drummond* v. *Cook Motor Lines,* 136 W. Va. 293, syl., 67 S. E. 2d 337. Such a verdict will be set aside when "it is clearly shown that the jury was misled by a mistaken view of the case." *French* v. *Sinkford,* 132 W. Va. 66, pt. 3 syl., 54 S. E. 2d 38. It is not essential that actual fraud, prejudice or passion on the part of the jury appear before a court is warranted in setting aside a verdict for excessiveness. In the case of *French* v. *Sinkford,* 132 W. Va. 66, 75, 54 S. E. 2d 38, 43, the Court, in setting aside a verdict, stated: "We must always reason from what a jury does, rather than attempt to show the mental process which actuated its act."

While this Court has displayed an appropriate reluctance to disturb jury verdicts for excessiveness, it has just as appropriately not hesitated to do so in proper cases. "True, the finding of a jury is seldom disturbed on account of amount, especially where the law sets up no measure or standard of value. But the finding of a jury is in no case beyond the healthful and salutary control of the courts. Strong as is the function of a jury as to damages, whether in cases purely sounding in damages for tort, or where the law

fixes a standard, its power is not arbitrary and unlimited, and cannot be allowed to work injustice and oppression." 5 M. J., Damages, Section 52, page 544.

In the case of *Virginian Railway Co. v. Armentrout*, 166 F. 2d 400, 4 A.L.R. 2d 1064, in setting aside a verdict rendered in the District Court of the United States for the Southern District of West Virginia, the court quoted from the opinion in the case of *Smith v. Times Publishing Co.*, 178 Pa. 481, 36 A. 296, 35 L.R.A. 819, as follows: " 'The authority of the common pleas in the control and revision of excessive verdicts through the means of new trials was firmly settled in England before the foundation of this colony, and has always existed here without challenge under any of our constitutions. It is a power to examine the whole case on the law and the evidence, with a view to securing a result, not merely legal, but also not manifestly against justice, — a power exercised in pursuance of a sound judicial discretion, *without which the jury system would be a capricious and intolerable tyranny*, which no people could long endure. This court has had occasion more than once recently to say that it was *a power the courts* ought to exercise unflinchingly.' "

I am wholeheartedly in accord with the well settled legal proposition that courts should be reluctant to set aside jury verdicts because of excessiveness; but I am just as strongly of the conviction that courts should be diligent in exercising the fundamental judicial function of protecting both parties against verdicts which are unwarranted in amount, whether too large or too small.

Every time any motorist goes upon a public highway, he is potentially both a plaintiff and a defendant. For every plaintiff there must be a defendant, and *vice versa*. Their numbers are perhaps about equal. Either role may involve great hardship completely contrary to the will, intent or desire of either. Such risks are an incident of motor vehicular travel on modern public highways. Problems resulting involve not only life and health, but they have economic implications also.

In performing their solemn roles in the vast horde of suits for damages arising from injuries inflicted by negligent motorists, courts are not interested in the return of big verdicts or small verdicts. Their solemn job is, so far as mortal capacity permits, to bend their energies toward the attainment of *fair* verdicts.

I concede to nobody a more genuine sympathy for the plaintiff in this case and for all other persons injured in person or property by negligent motorists. But I do feel that we cannot arrive at a fair verdict by posing the question: How much in money would you require to submit to such pain, suffering and disability? I apprehend that the law does not contemplate that such amounts be fixed across the bargaining counter. It is not a matter of bargain and sale, involving "a willing seller and a willing buyer." Perhaps only in literature has a value of a pound of flesh been determined on a contractual basis. The law has fixed no certain yardstick or formula for arriving at a fair verdict for personal injuries. It must be left to the conscience and sound judgment of those having the solemn duty of fixing the amount after carefully weighing all proper considerations.

This case involves a seriously injured woman, a resident of Webster County, against a Pennsylvania corporation. Any judge or practicing attorney of appreciable experience in trial courts cannot fail to recognize a jury trial of that nature as a contest of unequal odds. It is the type of contest which enhances the duty of a trial judge and of appellate judges in appraising the fairness and reasonableness of a jury's verdict.

Webster County, like the counties in which most of my past life has been lived, is not one of the populous, metropolitan or wealthy counties of the state. One hundred thousand dollar situations do not abound or occur frequently in that county or any other county of this state. It is inconceivable to me that a verdict of this nature would have been rendered in this case had the defendant been an average individual citizen of the county rather than a Pennsylvania corporation. Whatever may be a fair verdict in a case such

as this, the amount thereof cannot be permitted to vary according to the identity, status or nature of the defendant.

While the plaintiff's injuries were severe, various facts preclude her case from being an exceptional one from the standpoint of damages. She was forty-nine years of age when she was injured on April 1, 1960. She kept house for herself and two children aged sixteen and fourteen, respectively. She also did housework for others on a day-to-day basis. She estimated her earnings from this work at $60 a month. She was also receiving a monthly public assistance check of $87. She had sold cosmetics for one month prior to the date she was injured and had thereby earned $30. That is to say, she was not a young person, and she was in a comparatively low income bracket. Strange as it may seem, there was no proof of the plaintiff's life expectancy. As a matter of fact, the record in many respects leaves much to be desired by a court which is asked to approve a $100,000 verdict. Counsel for the plaintiff state in their brief that they have the case on a contingent fee basis of one-third. The verdict, therefore, is drawing interest which yields $4,000 annually to the plaintiff and $2,000 annually to her counsel.

The total of plaintiff's doctor and hospital bills is $1474.79. The evidence falls short of establishing future total disability, either temporary or permanent. Her chief attending physician, Dr. Jack W. Hunter, testified simply that "* * * she will continue to have pain and discomfort, especially in her neck and shoulder joints." He was asked the following question and gave the following answer: "Q. What in your opinion would be the effect of this pain and these injuries in her working and moving about in the normal manner of living? A. The usual routine would be somewhat restricted. She would not be able to do as much work as she previously did." The other physician who treated the plaintiff, Dr. George Edmiston, testified that she would have arthritis permanently and that it would get worse. Later he was questioned as follows: "* * * Would she be able to do her normal house work with the exception of the things that would require lifting and reaching, which you demon-

strated?", to which he replied, "I would not want to make a statement as to what her work capacity would be. I would assume she could do light house work which would not require any heavy work or lifting or reaching above the head." Dr. Hunter gave the following additional testimony:

"Q. Mrs. Williams' physical condition at the present time, would that permit her to carry on her normal house work?

"A. I would say she coud to a certain extent but not to the extent she did before.

"Q. You would not consider her a helpless person?

"A. No, indeed."

The plaintiff was hospitalized from April 1 to May 22, 1960. Between the date of her discharge from the hospital and the date of the trial, which commenced on May 17, 1961, a period of almost a year, she seems to have required relatively little attention by physicians. .

In other words, considering the plaintiff's age, her previous earnings, the extent of her hospitalization and medical treatment, the amount of her medical and hospital bills and the extent of her disability, I am not convinced that this is an exceptional case which would require such an exceptionally large verdict. I believe that in our effort to determine the reasonableness of a verdict, we should consider it on a relative basis. Since the Court upholds the verdict in this case, I can readily envision many cases coming before courts of this state which, when considered on a relative basis, will call for verdicts of several times $100,000 for personal injuries suffered by a single individual. I feel that such presents an unrealistic situation and one which cannot be supported from an economic standpoint. Defendants must be thought of in this connection, I believe, not simply as corporations which may be wealthy and carry heavy insurance, but rather I feel we must think of the defendant as an average defendant, whether individual, corporate or otherwise.

For reasons stated herein, I would reverse the judgment because of the excessiveness of the verdict and remand the case for a new trial.

The case from the standpoint of both primary negligence and contributory negligence is, in my judgment, a very close one. Chapter 17C, Article 10, Section 6 (b) of the Code, 1931, as amended, provides: "Where sidewalks are not provided any pedestrian walking along and upon a highway shall when practicable walk only on the left side of the roadway or its shoulder facing traffic which may approach from the opposite direction." The plaintiff's testimony indicates that she saw the defendant's truck, apparently in motion; that she assumed that it was about to proceed in the opposite direction; and that under such circumstances she turned her back toward the truck and proceeded to walk on the berm on the right side of the highway, where motor vehicles customarily traveled. However, this statute was not urged before the trial court and jury. The plaintiff's only excuse for walking on the right side of the highway was that there was a service station adjacent to the sidewalk on the opposite side of the highway. No map, plat or photograph appears in the record to portray the situation relative to this critical element of the case.

I do not base my dissent on questions pertaining to primary negligence and contributory negligence, but I do want to record my view that salutary statutory provisions of this nature are quite generally held to bar recovery by pedestrian plaintiffs. Perhaps in the majority of jurisdictions such conduct on the part of a pedestrian plaintiff is held as a matter of law to be negligence sufficient to bar recovery. *Lloyd* v. *Andrews,* 192 Va. 41, 63 S. E. 2d 734; *Crouse* v. *Pugh,* 188 Va. 156, 49 S. E. 2d 421, 4 A.L.R. 2d 1242; *Standridge* v. *Godsey,* 189 Tenn. 522, 226 S. W. 2d 277; Annotation 4 A.L.R. 2d 1253.