NANCYE LEE FRENCH, *an Infant, etc.*

*v.*

GEORGE H. SINKFORD, *etc.*

(No. 10025)

Submitted September 21, 1948.   Decided

November 16, 1948.

KENNA and LOVINS, JUDGES, dissenting.

*James S. Redmond,* for plaintiff in error.

*Joseph M. Sanders, Katz* and *Katz, Jerome Katz,* for defendant in error.

FOX, JUDGE:

The defendant below complains of a judgment of the Circuit Court of Mercer County, in the sum of $10,000.00, based upon the verdict of a jury for that amount, in an action at law in which Nancye Lee French, an infant, was plaintiff and George H. Sinkford, personally, and doing business as Sinkford Undertaking Company, was defendant. A motion to set aside the said verdict was made in the court below and overruled, and judgment entered thereon, to which exception was taken at the time; and on application of the defendant we granted this writ of error.

The plaintiff below, a female child eleven years of age, and who resided with her parents in the City of Bluefield, was injured by being struck by a motor vehicle, driven by an employee and agent of the defendant, on February 2, 1947. The child had attended Sunday School on that morning, and in returning home used a bus which transported her from the business district of the city to the neighborhood of her home, which was on Clovis Street. She alighted from the bus and attempted to cross the street to a point where Clovis Street intersected the street over which her bus travelled, and in doing so it was necessary for her to travel diagonally across said street. The defendant was engaged in the undertaking business, was the owner of an ambulance, and on the morning of the accident, an employee of the defendant took the ambulance to a filling station for the purpose of having an anti-freeze liquid test. Being advised that he would have to operate the engine in the vehicle for a period of time in order to warm it up before an accurate test could be made, he drove the same along the same

street that was travelled by the bus from which the plaintiff alighted, and reached the vicinity of Clovis Street at the time when the plaintiff was crossing the street in order to reach Clovis Street. There is dispute in the evidence as to the speed at which the ambulance was being operated, and on other points in the case, but there is sufficient evidence to justify the jury in finding that it was being negligently operated and that there was lack of reasonable care on the part of defendant's employee and agent.

One of the principle points relied upon here is that the plaintiff was guilty of contributory negligence. We do not believe that the defense is available under the evidence. In *Ewing v. Lanark Fuel Co.*, 65 W. Va. 726, 65 S. E. 200, it was held: "An infant 14 years of age or over, is presumed to possess sufficient mental capacity to comprehend and avoid danger, and if he relies on his want of such capacity the burden of proving it is on him; but if under the age of 14, he is presumed not to possess such capacity, and in an action by him for negligently causing his injury the burden of proving his capacity is on the defendant. This ruling has been followed in *Adams v. Chesapeake & Ohio Ry. Co.*, 73 W. Va. 698, 80 S. E. 1115; *Mills v. The Virginian Railway Co.*, 85 W. Va. 729, 102 S. E. 604; *Pierson v. Liming*, 113 W. Va. 145, 167 S. E. 131. The plaintiff, being of the age of eleven years at the date of the accident, and there being no testimony tending to rebut the presumption that she was incapable of contributory negligence, we hold that such defense is not available on the record as it now stands. Therefore, the only question, as to liability, is whether or not the defendant was guilty of primary negligence, and we are of the opinion that the evidence was sufficient to sustain that theory of the case. We refrain from discussing the evidence on this point, for the reason that, under our view of the case, there will have to be a new trial, and on such trial a different state of facts may be presented.

We are of the opinion that the verdict in this case was excessive and that the judgment complained of should be reversed on that ground. There is no real conflict on the law in this State as to the rule which should govern when a verdict is under attack on the ground of excessiveness. The difficulty is in applying it to particular cases and circumstances. In general, the rule is supported by the same principle as that applied to the setting aside of a verdict for lack of evidence to support it. The general authority that the jury is the sole judge of the weight of the evidence, and credibility of the witnesses, is upheld by many decisions of this Court; but on the other hand, it is equally settled law that this Court has the clear right to set aside a verdict which is against the clear preponderance of the evidence and, therefore, plainly wrong. These principles are clearly stated in *Burgess v. Gilchrist*, 123 W. Va. 727, 17 S. E. 2d 804.

The concrete question here involved, brings us to the case of *Holt v. Otis Elevator Co.*, 78 W. Va. 785, 90 S. E. 333, wherein it was held: "In a case of indeterminate damages for which the law gives no specific rule of compensation, the decision of the jury upon the amount of damages is generally conclusive, unless the amount is so large or small as to induce belief that they were influenced by passion, partiality, corruption, or prejudice, or misled by some mistaken view of the case." In *Landau v. Farr*, 104 W. Va. 445, 140 S. E. 141, it was held: "A verdict awarding compensation for pain and suffering will not be set aside as inadequate, unless the recovery is so small as clearly to indicate that the jury was influenced by improper motives." In *Morris v. The Baltimore & Ohio Railroad Company*, 107 W. Va. 181, 147 S. E. 759, it was held: "In an action for personal injuries, the amount of damages recoverable is generally left to the discretion of the jury, and the only limitation which the law imposes is that such damage be fairly compensatory and not such as to show partiality, prejudice or misconduct on their part." In *Floyd v. Chesapeake & Ohio Railway Company*, 112 W. Va. 66, 164 S. E.

28, the principle announced in *Holt v. Elevator Co.*, *supra*, is adopted by quoting point 5 of the syllabus in said case. In *Collins v. Skaggs*, 110 W. Va. 518, 159 S. E. 515, it is stated that: "The law furnishes no measure of damages for pain and suffering. In such case, the decision of the jury upon the amount is generally conclusive, unless it is so large or small as to induce the belief that the jury was influenced by passion, partiality, corruption, or prejudice or misled by some mistaken view of the case." In *Webb v. Brown & Williamson Tobacco Company*, 121 W. Va. 115, 2 S. E. 2d 898, the rule was stated in the body of the opinion: "The court is unanimous in the view that the verdict is probably excessive; but a majority is of the opinion that, in view of the well known rule that the verdict of a jury will not be disturbed except where it plainly appears to have resulted from mistake, partiality, passion, prejudice or lack of due consideration, the excess finding is not such as would warrant a reversal of the judgment and a setting aside of the verdict on that ground." *Thomas v. Lupis*, 87 W. Va. 772, 106 S. E. 78, is cited as authority to support this statement. In *Yuncke v. Welker*, 128 W. Va. 299, 36 S. E. 2d 410, it was held: "In an action for personal injuries, the damages are unliquidated and indeterminate in character, and the assessment of such damages is the peculiar and exclusive province of the jury." and further: "The verdict of a jury in an action for personal injuries will not be set aside as excessive unless it is unsupported by the evidence, or is so large as to indicate that the jury was influenced by passion, partiality, prejudice, or corruption, or entertained a mistaken view of the case." In *Raines v. Faulkner*, 131 W. Va. 10, 48 S. E. 2d 393, it was held: "A verdict of a jury will be set aside where the amount thereof is such that, when considered in the light of the proof, it is clearly shown that the jury was misled by a mistaken view of the case." In that case the defendant was accused of indecent assault, the verdict was returned in favor of the plaintiff for three thousand dollars compensatory damages, and two thousand dollars as punitive damages. The verdict for compensatory

damages was set aside as excessive because the majority of the Court was of the opinion that the indignities allegedly suffered by the plaintiff were not of such character as would support a verdict of that amount, and the case was remanded for a new trial.

From the foregoing citations of authority, it will appear that the rule which supports the jury in fixing damages in a case where such damages are of an indeterminate nature is rarely departed from. But none of these cases question the right of a trial court, or this Court, to set aside a verdict which, in its opinion, is clearly excessive. The rule which supports the theory of the right of juries to determine the issue on questions of the amounts of damages, is based upon the principle which, ordinarily, supports jury findings of fact. But, as stated above, it is clear that this Court possesses the right to interfere when a verdict of a jury appears to be plainly wrong, either on the right of recovery, or the amount thereof. We think this is such a case, and that we are not assuming any new authority when we so hold.

It must be admitted that the child suffered what would be called a serious injury. Her right leg was broken below the knee. There was a compound comminuted fracture. According to medical evidence in the case, a simple fracture is where the break is clear cut, and there is no shattering of the bone; a comminuted fracture is where there is a break and the bone is shattered; and, a compound fracture is where the skin is broken. Therefore, the injury to this child should not be minimized. But, on the other hand, we have the evidence of physicians, whose qualifications are not questioned, to the effect that from a fracture of the character suffered by the child there is usually a complete recovery in from six to eight months. The trial in this case was held some four months after the injury, and at a time when the child was still on crutches, and her recovery was not complete. It was impossible to state, with any reasonable degree of accuracy, just what time would be necessary for com-

plete recovery, or the ultimate result of the injury. Dr. Davidson testified as to the nature of the fracture, based upon an X-ray of the injured limb. He did not further treat the child. On cross-examination he was asked whether, at the time of his testimony, there was a firm union of the fragments of the right leg and good functioning. To which he replied: "There is, at the present time, a full union of the small bone, and the other is progressing nicely. I don't believe it is completely united at the present time." He was then asked: "You do not anticipate any functional disability by reason of that fact?" To which he replied: "Not from what you can see on the X-Ray." On redirect examination he stated that he would not expect any functional disabilities as a result of the injury. Dr. St. Clair was the first physician to see the child after her injury. He states: "When I saw the child she was brought into the operating room, having been admitted down stairs a short time before and having previously had X-Rays. When she arrived in the operating room she was upset, of course, and the examination at that time obviously showed a fracture of the right lower leg. She had two lacerations on her right leg near the site of fracture on the medial and lateral aspects of the leg. There was some bleeding from these, particularly when there was any movement of the leg. On the left leg, below the knee, she had a third laceration, which was, I would say, two inches or probably longer. There was not any profuse bleeding from any of these lacerations at the time." He states that the child was put to sleep with ether, her leg manipulated, placed in a cast, and about a week later the patient was turned over to Dr. Hosmer. Dr. St. Clair looked after her during the first week after her injury. He stated that there would be some damage to the muscles and soft tissues, as in any fracture of this character, and that the scars on the child's leg would be permanent. On cross-examination he was asked: "You were asked whether fractures of the bone, healed, would leave a permanent injury. As I understand you will always be able to see where the union has been made, or where they knit together, is that the

situation?" To which he replied: "That is right, as I said, by X-Ray." He was then asked: "But it does not follow that there are any functional disabilities from that union, does it?" To which he answered: "No." He was then asked: "And there is nothing in these X-rays that you have examined to cause you to suppose that there will be any functional disabilities in this particular case, is there?" To which he answered: "It is impossible to say there won't be. In my opinion, however, from the X-Ray and the healing she has and her age we would not expect functional disability." He was then asked: "From the progress which has been made, based on your knowledge of her case and the X-Rays, you would not anticipate any functional disability, would you?" To which he answered: "That is true." On redirect examination he was asked: "Is it not true that you can't actually determine what might be the case in the condition of this child as to functional use of the leg in the future? There is no certain way or test at this time to determine that?" To which he replied: "I think that is probably—sounds to me like the same thing. I don't think you can determine at this time and say she will not have functional disability. However, from the progress of the case at this point I would say she will not." He was then asked: "There is no absolute way to determine as a finality, or mathematical way to determine that at this time?" To which he answered: "That is right."

Dr. Hosmer, who had charge of the patient beginning about one week after the accident, in answering questions relating to the extent of the child's injury stated that there was no way of determining just when the child would be able to walk normally, but when asked if it would be as much as six months said that it should not be. He was then asked: "I want to ask your opinion. . I believe that a fracture such as she sustained, and which you testified about, are permanent by nature?" To which he answered: "There will always be X-Ray evidence of it, yes, sir." He was then asked: "And has that been found as a result of these fractures and injuries?" To

which he replied: "Yes, I think that is the natural sequence of such an injury." He was then asked: "Can this child continue to have pain as a result of this injury?" To which he replied: "You could not anticipate a whole lot of pain with the amount of union and everything you have there now." He also stated that at that time there was some evidence of pain when the child's leg was touched; that she was then disabled, but that he could not state definitely how long her disability would continue; that there was some damage to soft tissues. On cross-examination Dr. Hosmer was asked the following question: "A fracture where you get a good union or knits together is just as strong at that point as it is at any other point?" To which he replied: "That is right." He was then asked: "Is there anything in connection with this particular fracture and the progress thus far made that leads you to believe there will be any functional disability?" To which he replied: "I would not anticipate there would be any." He was then asked: "You do not expect any functional disability from this injury?" To which he replied: "That is right." He then stated that the progress of the child had been normal and usual; that in the ordinary course, subject to considerable variation, she should be able to use her leg and walk in from six to eight months time, and that she should be able to use her leg as she did before the injury. He was further asked: "When you say you do not anticipate any functional disability, you mean, do you not, that you anticipate this little girl will be able to use that leg in the future just as she did before the accident?" To which he answered: "That is right." He also states that, with the passing of time, the scar on the left leg would be made smaller and less obvious. On redirect examination he stated that it was usual to estimate disability from an injury of the character suffered by this child from six to eight months. On being asked if there was a probability that functional disabilities would result from the injury he stated: "There is a probability, but you don't anticipate it." And on recross-examination in answer to a question: "Does it come down to this: From the pro-

gress that has been made, based on the experience of thousands of cases of fractures of this type, that you do not expect any functional disability in this case?" To which he replied: "That is right." He was then asked: "And you think, from the thousands of cases of this particular type that you have treated, that this girl, at the end of six to eight to twelve months, will have the same use of that leg that she had before?" To which he replied: "That would be my opinion, yes, sir."

We have quoted this evidence of the only witnesses who were competent to pass upon the probable result of plaintiff's injuries. We conclude that these physicians did not believe that this child would suffer from any permanent disability on account of her injury. The case is one where there has been an injury of a nature from which complete recovery may be expected, and normal recovery is in progress, and according to the testimony the period of recovery need not exceed twelve months. In their judgment, upon full recovery, the child should be able to use her leg to the same extent as she would have been able to use it had the injury not been sustained. Of course, it is common knowledge that there will always be evidence of the injury if an X-ray is used, and some disfigurement. Naturally there was some pain and suffering, but four months after the date of the injury it had apparently disappeared, and there was nothing to anticipate it would recur. We do not think this showing sufficient to justify a verdict for ten thousand dollars.

There is no reason to suspect the existence of fraud, prejudice or passion in this case. It is rare indeed where either can be shown by direct or circumstantial evidence. We must always reason from what a jury does, rather than attempt to show the mental process which actuated its act. No doubt, the jury in this case was not actuated by any improper motive, but we think they took a mistaken view of the case, which, under all authorities, furnishes ample grounds for setting aside a verdict where the amount thereof is excessive. Furthermore, this case was tried at a time when, in the very nature of things,

the jury had to speculate as to the final result of the injury suffered by the plaintiff. There was, in our opinion, little, if any, ground for speculating that there would be any permanent injury. All of the evidence controverts that assumption. But, there may have been in the minds of the jury the belief that they could assess damages on the basis of a probable or possible permanent disability.

We reverse the judgment of the Circuit Court of Mercer County, set aside the verdict of the jury, award the defendant a new trial, and remand the case to the said Circuit Court for that purpose.

> *Judgment reversed;*
> *verdict set aside;*
> *new trial awarded.*

KENNA, JUDGE, dissenting:

To my mind it is plain that the amount of the verdict in this matter does not indicate prejudice, bias or corruption on the part of the jury in favor of the plaintiff and consequently the judgment below should not be reversed for that reason.

When injured the plaintiff was eleven years old and was being schooled as an acrobatic dancer. She suffered a severe laceration on her left leg and a compound fracture of both the bones in her right leg so that after being in the operating room for approximately one hour in the Bluefield Sanitarium she was kept there for nineteen days. A compound fracture is where particles of bone have cut the flesh through to the surface. It does not appear in this instance that the bone remained protruding after the cut. The wounds in both legs were closed with sutures, the bones in her right leg manipulated into proper position and that leg encased in a heavy cast from the toes to the middle of the thigh. Plaintiff wore that cast for sixty days when it was replaced by one that was lighter. She remained in bed after her injury for six weeks and was still on crutches at the time of trial which

followed the injury by a little over three months. The opinion of the doctors is that within a year she will be back to normal. None would state positively that there will be no permanent functional disturbance.

It is hardly worthwhile to cite authorities on the question of the elements going to make up compensatory damages. The amount that this plaintiff sought to recover was $25,000.00. The jury awarded a verdict of $10,000.00 It may be a very unfortunate circumstance that the defendant believed he had insurance coverage until after the trial and that his insurer then went through bankruptcy. That fact of course is not to be considered in determining the verdict's excessiveness.

I am authorized to say that Judge Lovins joins in this dissent.