THE INTERNATIONAL NICKEL COMPANY, INC.

*v.*

COMMONWEALTH GAS CORPORATION

(No. 12669)

Submitted April 30, 1968.          Decided July 16, 1968.

Rehearing Denied November 8, 1968.

*Steptoe & Johnson, William F. Wunschel, Scheer, Meek & Vinson, J. B. Meek, Sullivan & Cromwell, William E. Willis, Edward W. Keane,* for appellant.

*Huddleston & Bolen, Jackson N. Huddleston, William C. Beatty,* for appellee.

BROWNING, JUDGE:

Plaintiff, the International Nickel Company, Inc., a corporation, hereinafter referred to as Nickel, is engaged in manufacturing at a plant in or near the City of Huntington,

West Virginia, in the process of which it consumes large quantities of natural gas. The defendant, Commonwealth Gas Corporation, hereinafter called Commonwealth, is a private corporation engaged in the production and sale of natural gas. For a number of years Commonwealth, and its corporate predecessors, have supplied Nickel with the major portion of its gas requirements at a fixed price per MCF. Commonwealth is not a public utility and its sales are not subject to regulation by any public authority.

In 1954, Nickel and Commonwealth re-negotiated or amended their previous contract which called upon Commonwealth to supply and for Nickel to take a minimum of 90,000 MCF of gas each month at a price of 30 cents per MCF. This amendment, dated May 1, 1954, insofar as here pertinent, also required a minimum of 90,000,000 cubic feet of gas per month to be supplied and taken for a period of twenty years, and for the first time contained a price adjustment provision as follows:

"VI. The price of all gas purchased by Inco [Nickel] commencing June 1, 1954 shall be 41 cents per thousand cubic feet subject to adjustment in accordance with the following provisions, provided, however, that no such adjustment shall become effective except upon written notice to all of the parties hereto:

"The average price per thousand cubic feet, determined by applying the rates of United Fuel Gas Company in effect on June 1, 1954, payable by an industrial consumer of natural gas in the Huntington, West Virginia area regularly purchasing 90,000,000 cubic feet of gas each month, would be 40.05951 cents. In the event of future changes in the average price per thousand cubic feet which would be payable by such a consumer, the above contract price to Inco of 41 cents per thousand cubic feet shall be adjusted up or down in an amount equal to the amount of the change in the average price per thousand cubic feet which would be payable by such a consumer of 90,000,000 cubic feet per month. In determining for the purposes of the preceding sentence the average price per thousand cubic feet which would be payable by such a con-

sumer of 90,000,000 cubic feet per month, the rate to be applied shall be the rate at the time available to industrial consumers of United Fuel Gas Company (or its successor) in the Huntington, West Virginia area or, if United Fuel Gas Company (or its successor) should cease to be a public utility supplier of gas to industrial consumers in the Huntington, West Virginia area, the rate at the time available to industrial consumers of such other company as may then be the largest public utility supplier of gas to industrial consumers in the Huntington, West Virginia area."

It is undisputed that the figure of 41 cents per MCF was arrived at by adding approximately .01 cent to the rate provided by General Service Schedule No. 1 of the United Fuel Gas Company as filed and approved by the West Virginia Public Service Commission, the only "rates" which United Fuel had in effect on that date and, as testified to by the President of Commonwealth, this basis was suggested by Mr. Cabell, the Executive Vice President of Nickel. General Service Schedule No. 1 is "available for general residential, commercial and industrial service from the Company's [United Fuel] facilities in West Virginia." This rate schedule remains in effect, with several increases and two reductions in rates as approved and ordered by the Public Service Commission, and as of 1963, the year in which the present action was instituted, United Fuel continued to serve some 195 industrial customers, an average of 40 of which were located in the City of Huntington. However, in late 1954 or early 1955 United Fuel began the practice of entering into special contracts with certain industrial consumers at prices per MCF appreciably lower than those set forth in General Service Schedule No. 1. These special contracts, in the main, provide for an interruptible flow of gas at the option of United Fuel, and a minimum monthly charge without regard for, and no right to recover, the amount of gas not taken, contain automatic purchased gas and tax adjustment provisions and, while filed with the Public Service Commission were usually not filed until approximately one year after their effective date. While several of these special contracts call for a supply of gas in

excess of that required by Nickel under its contract with Commonwealth, it will be noted that these excess demands apply to plants at Charleston, Belle and Ravenswood and none might be said to be within the "Huntington area" unless by reason of the limited number of consumers using 90,000,000 cubic feet of gas or more per month, the entire area served by United Fuel might be said to be in the "Huntington area".

Commonwealth, since the inception of the contract with Nickel on May 1, 1954, has given Nickel the required notice of each rate increase in General Service Schedule No. 1 when approved by the Public Service Commission and thereupon charged Nickel for gas in accordance with that rate plus the approximate one cent additional provided by the contract. On two occasions after United Fuel had put into effect increases in rate the Public Service Commission refused to allow the full amount of the increase, establishing lower rates, and Commonwealth refunded the amount disallowed to Nickel. On one of these occasions, Commonwealth having calculated the amount of refund due, tendered that amount to Nickel which Nickel refused to accept until its own accounting department had verified it as the correct amount, the only figures which could have been used to so verify the account being United Fuel's General Service Schedule No. 1 as modified.

In 1963, Nickel, having become aware of the price obtainable under United Fuel's special contracts, made demand upon Commonwealth for a refund commensurate therewith and, upon Commonwealth's refusal to comply, instituted the present action demanding in excess of $1,000,000.00 as alleged overpayment under the provision of the contract heretofore quoted plus accumulated interest. Commonwealth answered, denying that any amount is due Nickel as a refund under provision VI, hereinbefore quoted, contending that the proper amounts were charged and paid and asserting further: (1) all payments by Nickel were voluntarily made; (2) Nickel failed to question the amount within 10 days of receipt of billing as required by contract;

(3) Nickel is guilty of laches; (4) any right of action is barred by the statute of limitations; (5) Nickel is estopped to maintain this action. Upon a stipulation of facts and certain testimony taken before the Judge of the Circuit Court of Cabell County, sitting without a jury, the case was submitted for decision and the trial judge entered judgment for Commonwealth, to which judgment this Court granted an appeal on May 22, 1967.

The primary issue in this case is whether Commonwealth owes Nickel a sum of money in excess of $1,000,000.00 under the terms of the contract of 1954. There is no allegation in the complaint of fraud and a determination of this issue rests squarely upon the provisions of the contract. The contract of 1954 actually was a renewal of previous agreements between the parties beginning in 1925 but the 1954 agreement is unique in that it contained an escalation clause as to prices whereas the previous agreements between the parties provided for a specific sum of money for each MCF of natural gas taken from Commonwealth. Of course if the vital provision of that contract, Article VI, is clear and unambiguous much of the record made up in the trial court cannot be considered for when a written instrument, whether a constitution, a statute, a contract, or other such instrument is clear and unambiguous, resort cannot be had to the rules of construction or interpretation to ascertain the intent of the parties. These are the first two syllabus points in the very recent case of *Berkeley County Pub. Ser. Dist., etc.* v. *Vitro Corp. of America,* 152 W. Va. 252, 162 S. E. 2d 189:

"1. The mere fact that parties do not agree to the construction of a contract does not render it ambiguous. The question as to whether a contract is ambiguous is a question of law to be determined by the court.

"2. Extrinsic evidence may be used to aid in the construction of a contract if the matter in controversy is not clearly expressed in the contract, and in such case the intention of the parties is always important and the court may consider parol evidence in connection therewith with regard to condi-

tions and objects relative to the matters involved. However, where the language of a contract is clear the language cannot be construed and must be given effect and no interpretation thereof is permissible."

See also, *Cotiga Development Co.* v. *United Fuel Gas Co.,* 147 W. Va. 484, 128 S. E. 2d 626, and *In the Matter of the Estate of Resseger* v. *Battle, Com'r.,* 152 W. Va. 216, 161 S. E. 2d 257. *Carolina Ceramics* v. *Carolina Pipeline Co.,* (S.C.), 161 S. E. 2d 179, decided April 15, 1968, was an action to recover alleged overpayments made under a contract whereby a pipeline company agreed to supply natural gas to a manufacturer for a price to be determined under an escalation clause. The trial court held that contract to be clear and unambiguous and upon that finding directed judgment for one of the parties. The appellate court reversed the trial court in holding that the terms of the agreement were clear and unambiguous, found that an ambiguity existed, and remanded the case for the taking of all admissible relevant evidence which would tend to prove the real intent of the parties in the execution of the ambiguous contract. It is apparent from that decision and from several decisions of this Court that judges are not always in agreement as to whether a written instrument is clear and unambiguous or otherwise. This is the second headnote in the *Carolina Ceramics* opinion: "Where written contract, obligating pipeline company to provide natural gas to manufacturer, contained an escalation clause providing that price was to be raised or lowered depending upon price of gas to pipeline company from its two sources of supply, but clause did not specify from which source of supply price was to be determined, contract was ambiguous, and parties should have been allowed to prove their intent in executing such contract."

The first question for determination is whether Article VI, and it is the only provision relating to price in the contract in question, is clear and unambiguous and the intent of the parties can be ascertained from its language or whether there is an ambiguity in its terms, making extrin-

sic evidence admissible and proper for consideration in that regard. The Court finds that the language is ambiguous and therefore proceeds under the rules applicable to such a situation to determine the intent of the parties. Of course that does not mean that the terms of the section are not important. They are extremely important but it means that we may go beyond the language used in Article VI to ascertain the intent of the parties in using certain terms which are found therein. Although the terms "interpretation" and 'construction," relating to a determination of the meaning of a written instrument, seem to be used synonymously in recent times, originally and perhaps now they have a slightly different meaning. "Interpretation" refers primarily to the definition and use of words or phrases in a particular portion of such an instrument whereas "construction" embodies a broader concept which permits going beyond the express words used. See Vol. 22, Words & Phrases, p. 384.

It is to be observed that the 1954 contract was prepared by legal counsel for the plaintiff. The words "rate" or "rates" of United Fuel Gas Company or its successor are used three times in Article VI. The "rates of United Fuel Gas Company in effect on June 1, 1954," could have meant only the rate established by General Service Schedule No. 1 of that company at the time as that was the only rate available to an industrial customer or any other customer of that company in the Huntington area or elsewhere in the state. By the escalation provision of Article VI it is provided that in the event of future changes in the average price per thousand cubic feet which would be payable by an industrial consumer of 90,000 MCF per month in the Huntington area the rate of Nickel would be adjusted accordingly. Article VI then provides that should United Fuel cease to be a public utility supplier of gas that the rate should be governed by the rate available to industrial consumers of such other company as "may then be the largest public utility supplier of gas" in the area, thus restricting the basis for the rate to that established and approved by a regulatory body limiting the rate of return which a

supplier of gas may receive on its investment. In order to establish by a preponderance of the evidence the allegations of its complaint it was necessary for Nickel to show that a lower "rate" than that provided by its contract with Commonwealth was "available" in the Huntington area to an industrial consumer of comparable volume and that Commonwealth in violation of the contract had refused to make such adjustment. To prove such, the evidence of C. Homer Workman, Executive Vice President of United Fuel Gas Company, was taken and he testified that beginning approximately a year after the execution of the 1954 contract between these parties his company began making special industrial contracts with large consumers as well as some smaller consumers at rates below that provided by General Service Schedule No. 1. However, from the details of these special contracts, developed upon cross-examination, it is obvious that there was no uniform "rate" or price per MCF in any of those contracts and some of them had conditions therein relative to taxes, etc., which made it practically impossible to determine the exact rate per MCF that these special industrial consumers were paying. Specifically did Mr. Workman state that his company had entered into no special industrial contracts "in the Huntington area" with a consumer "regularly purchasing 90 million cubic feet of gas each month". Furthermore this witness stated under oath that the price per thousand cubic feet paid under the special contracts was not approved by the Public Service Commission and that copies of such contracts were not filed with the Public Service Commission at the time they were entered into and in some instances as long as a year afterwards.

Nickel argues that the acceptance of copies of these contracts by the Public Service Commission without objection to such procedure is tantamount to approval of such contracts and thereby even in a technical sense the word "rate" is tantamount to the word "price" in the contracts relating to the amount paid per thousand cubic feet of gas. As heretofore stated the contract in question was prepared by counsel for Nickel and inasmuch as this Court has determined

that it is ambiguous it is permissible to consider the testimony of the witnesses with regard to what transpired at or immediately before the signing of the contract. Although there may be some conflict in the oral testimony, the finding with regard to such by the trial judge, who by agreement heard the case without a jury, is entitled to the same weight as that of a jury verdict. Mr. T. A. McEachern, Jr., President of Commonwealth, who was in 1954 vice president of that corporation, was asked these questions and made these answers: "What guide or standard, if any, was to be used for determining price and increases or decreases in price? A. Well, the proposal was made to use as a base rate Schedule No. 1 of the United Fuel Gas Company. Q. Who made this proposal? A. That was made by Mr. Cabell. Q. Of International Nickel? A. Of International Nickel." This witness was later asked this question and made the following answer: "Q. Are you saying that the tenor of the discussions prior to the May, 1954, agreement was that regardless of what the large industrial customers of the United Fuel Gas would pay over the coming years, it was going to be General Service Schedule No. 1? A. That's right. We were only dealing with one industrial rate. That was the only one we knew about, the only one we discussed, and it was a rate that was predicated upon the figures, or the various brackets of rates in Rate Schedule 1. We didn't talk about large, big, little, it was just that rate, 90,000,000 feet of the industrial rate schedule, or Rate Schedule No. 1." This witness was asked these further questions and made the following answers: "Q. Let me phrase it this way. You agreed with Mr. Cabell and other representatives of Inco that in calculating the 40.0591 cent figure in Article VI that you would use the General Service Schedule No 1, is that correct? A. That's right. That is where we got it from. Q. And that was the only rate that you knew of that was at that time available to a customer regularly purchasing industrial gas from United Fuel? A. That's right. That was the only rate we knew about. That is correct." The evidence is uncontradicted to the effect that over a period of nine years the practical construction of the contract

indicates that such testimony was true and four upward and two downward adjustments of the rate Nickel was to pay Commonwealth under the contract were made pursuant to changes in the rate of United Fuel General Service Schedule No. 1. It is true that it is alleged by Nickel that it agreed to such adjustments because of its lack of knowledge of the fact that United Fuel Gas Company had been entering into special industrial contracts at rates lower than that provided in Nickel's contract and Nickel contends that it was the duty of Commonwealth to inform Nickel° with regard to these special contracts. Conceding that Nickel was unaware of these special contracts between 1954 and 1963, there is only the vaguest evidence that Commonwealth was aware of them and, presumably, the means of obtaining knowledge of them was equally available to both. Mr. Morris, Counsel for Commonwealth at the time of the consummation of the 1954 agreement and thereafter, admitted that he saw a contract with one of United Fuel's customers but that he did not examine it in detail and apparently was not impressed by it inasmuch as it was Commonwealth's contention then and now that the 1954 agreement was not subject to a rate change by action of United Fuel except a change in General Service Schedule No. 1. It is almost inconceivable that none of the parties or their attorneys would at least have heard about such special contracts during that period of years, but this Court does not think it of much significance whether Commonwealth did or did not know of such contracts.

Mr. Russel W. Morris, attorney for Commonwealth, as heretofore stated, was asked if there was any particular guide or standard that was discussed by the parties prior to the drafting of the contract and stated: "The guide was this: That while the specific words 'General Service Schedule No. 1' were not used, but the language fixing the price at that time and the language fixing the price for adjustments either up or down are identical, and this is the price which we did use at that time. It came from United Fuel General Schedule 1 available to domestic, commercial, and industrial consumers." He was further asked this question

and made the following answer: "Q. And that whatever increases or decreases were made in Commonwealth's rate to Inco were pursuant to the agreement between them, is that correct? A. Whatever increases or decreases were made by Commonwealth to International Nickel were made pursuant to order of the Public Service Commission which affected the rate of United Fuel Gas Company, because this is the basis of paragraph 6. This is the way we agreed to make these adjustments, whether they be up or down, sir."

The 1954 contract between Nickel and Commonwealth specifically provides that the former shall have priority over all other customers in their area in receiving a minimum amount of 90,000,000 cubic feet of gas a month. Mr. Workman, Vice President of United Fuel, was asked about the provisions of their special industrial contracts with regard to this matter. This witness gave the following testimony in that regard:

"Q. Mr. Workman, United Fuel can curtail deliveries to Special Industrial Contract customers at any time in order to maintain adequate deliveries to its customers purchasing under General Service Schedule No. 1, can't it?

". . .

"A. It is recognized in the contract that it can do that.

". . .

"Q. And have you on occasion done just that thing?

"A. We have.

"Q. Isn't it a fact that the price that you design in your contracts are designed to allow curtailment by United Fuel, since under the terms of the contract exposure to curtailment is always present whether it is exercised or not? Do you understand?

"A. That is considered in designing the rates.

"Q. And the fact that United Fuel can curtail would have considerable bearing on what rates they were going to charge?

". . .

"A.   As to how much consideration is given in fixing the rates, or to what extent it is given in fixing the rates, some consideration is given.   For firm service the rate would be higher."

The record shows that United Fuel has, or had during the period involved, only three special contracts providing for the sale of a minimum volume of 90,000,000 cubic feet or more a month, they being with Kaiser at Ravenswood, West Virginia, du Pont at Belle, West Virginia, and Union Carbide Company at Institute, West Virginia.   A fourth contract with Appalachian Electric Power Company at Ravenswood, West Virginia, while unlimited as to amount, was only for stand-by purposes.   An examination of the contracts between United Fuel and the three companies and the approximately sixteen smaller industrial agreements shows that there is no consistency as to rate, volume, length of contract or otherwise from which it could be determined that Nickel, under the provisions of the 1954 contract, is entitled to a certain specific rate per MCF upon the assumption that the terms of that contract were broad enough to encompass an adjustment in view of United Fuel's granting such contracts to certain industrial consumers in this state.   There is no consumer in the Huntington area receiving 90,000 MCF of gas from United Fuel at this time and never has been according to Mr. Workman's testimony.   There is no provision in any of the special contracts, certainly no valid provision therein, by which United Fuel could guarantee to deliver to a contracting party a minimum volume of gas regardless of the consequences to the supply of gas available for residential and other small consumers.   To repeat, there is a valid provision in the contract between Nickel and Commonwealth to that effect.

At this point it should be stated that while Nickel has contended and cited authority in an effort to prove that these special contracts between United Fuel and industrial consumers, even though not specifically approved as to rate, etc., were valid, whereas Commonwealth has contended to the contrary, the trial court found that these contracts were invalid, apparently based upon the premise that no "rate"

could be established by United Fuel without pursuing the statutory method for the establishment of a rate. Neither the United Fuel Gas Company, the Public Service Commission, nor any of United Fuel's special contract customers is a party to this proceeding and this Court will not and does not believe it necessary to pass upon the validity of such contracts. However, we are of the view that the varying prices per MCF being paid by the special customers to United Fuel are not "rates" as contemplated by the parties to the contract of 1954 and as that word is used therein. Furthermore, even if it should be so held that such was contemplated, the evidence is uncontradicted that there is no industrial consumer of United Fuel "in the Huntington area . . . regularly purchasing 90,000,000 cubic feet of gas each month." The phrase "which would be payable by *such* a consumer of 90,000,000 cubic feet per month," relates to the average price paid per MCF by an industrial customer in the Huntington area under Rate Schedule No. 1. (Italics supplied.) And although there are three industrial customers in this state purchasing more than 90,000,000 cubic feet of gas per month from United Fuel there is not only not such a customer in the "Huntington area" but there is no evidence from any witness in this case that United Fuel can make "available to industrial customers of United Fuel Gas Company [or its successors] in the Huntington, West Virginia area" such a volume of gas per month at any price per MCF.

In view of our holding with regard to the principal question presented we find it unnecessary to discuss the other issues presented which were passed upon by the trial court, but only for the reason that, as stated in its opinion, "to the end that they may be considered in the event of an appeal being taken herein." Furthermore, to repeat, we do not pass upon the validity or invalidity of the special industrial contracts which this record discloses exist between United Fuel and many of its customers in this state.

The judgment of the Circuit Court of Cabell County is affirmed.

*Affirmed.*