CHARLES G. RHODES

*v.*

NATIONAL HOMES CORPORATION

(No. 13910)

Decided September 18, 1979.

Rehearing Denied November 8, 1979.

*Orville L. Hardman* for appellant.

*John S. Bailey, Jr.,* for appellee.

MILLER, JUSTICE:

Charles G. Rhodes, the plaintiff below, appeals a final order of the Circuit Court of Wood County setting aside a jury verdict in his favor in the amount of $59,191.84 returned against his employer, National Homes Corporation (herein National).

Rhodes had brought suit to recover certain commissions he claimed were due him as a result of sales of housing units manufactured by National. He claimed that under his District Sales Manager contract (herein commission contract) with National, he was entitled to a 5 percent commission on the sales price of the housing units but that he had only been paid a 1 percent commission.

The area of controversy in regard to the written commission contract centered on its Article II, entitled "Earnings," which set out a schedule of commissions that Rhodes would be entitled to receive according to the type of sale. The basic commission was 5 percent, exclusive of sales tax, transportation, builder-dealer commission, and unspecified other costs. A 1 percent commission was to be paid on a Series 70 home. The contract also provided: "[W]here the Builder-Dealer earns Volume-Discounts, the District Sales Manager's commission, based on each volume plateau, shall be less than the normal 5% ....", and a graduated scale of commissions based on sales volume was set out.[1] The contract furthur provided that certain special sales could be excluded from the contract, and concluded with a provision that as to sales where "price negotiation is necessary the District Sales Manager's commission rate will be depressed ... but in no event be less than 1%." [Ellipsis in original]

The commission controversy arose with respect to seven housing developments sold by Rhodes to Theodore D. Morlang which had a total purchase price of $1,479,813. Rhodes claimed that he was entitled to a 5 percent commission on these sales, while National asserted that a 1 percent commission was due and that it had paid Rhodes this amount.

At trial, Rhodes introduced the commission contract which covered the year 1968. He testified that in March of 1968, he met with a Mr. McKenzie, an officer of National, and a Mr. Wilmoth, who was associated with the Morlang project, and that the parties were in the final stages of completing the sale of the housing units. A discussion ensued between Rhodes and McKenzie as to Rhodes' commission on the Morlang sale. Rhodes asked

---

[1]This scale was as follows:
"$  75,000 - $ 149,000 - 4 1/2%
   150,000 -   224,000 - 4%
   225,000 -   299,000 - 3 1/2%
   300,000 -   375,000 - 3%
   Over $375,000      - 2 1/2%"

if his 5 percent commission were assured, and, according to Rhodes' testimony, McKenzie responded that Rhodes would not receive "any lower than the Builder-Dealer's commission."

There was some evidence suggesting that the Morlang project was a builder-dealer arrangement, which under the contract schedule (*see* Note 1 *supra*, at 2) would have yielded a 2-1/2 percent commission to Rhodes at the approximate sales price of $1.5 Million. National, however, through its chief witness McKenzie, viewed the commission level as 1 percent because the project came under that section of the contract where prices were negotiated independently of the published price list: "[T]he District Sales Manager's commission rate will be depressed ... but in no event be less than 1%."[2] In his testimony Rhodes denied that the prices were negotiated specially under this provision. The evidence also tended to establish that the separate written sales contracts were signed on the seven phases of the Morlang project beginning in 1968 and extending into 1970.

At the conclusion of all the evidence, the court gave, among other instructions, a plaintiff's instruction consisting of a series of possible findings keyed to the various commission levels stated in the contract and asserted by the parties. The first paragraph stated that if the jury found from a preponderance of the evidence that the parties had agreed on a 1 percent commission, then the verdict should be in favor of National.[3]

---

[2]Mr. McKenzie's statement at trial was:

"In our district sales manager contract which has been entered into evidence, on these type projects for special pricing or depressed pricing because of difficulty due to the volume of the business, it is clearly stated that we can reduce or depress our salesmen's commissions as low as 1%. In the Morlang project ... that 1% was not even included in the price of it."

[3]This was based on the undisputed evidence that Rhodes had already been paid a 1 percent commission.

After repeating the preponderance of the evidence rule, the second paragraph stated that if the jury found the parties had agreed to a 5 percent commission, then Rhodes would be entitled to a commission of $73,990.65, less the $14,798.81 already paid, or the amount of $59,191.84.

The third paragraph stated that if the jury found the parties had agreed to a 2-1/2 percent commission, then Rhodes would be entitled to $36,995.32, less the $14,798.81 paid, or $22,196.51.

The final paragraph stated that if the jury found the parties had no "meeting of their minds" as to the commission, then Rhodes was not entitled to recover.

National objected to this instruction on the basis that it was not warranted by the evidence, that it invited the jury to compromise the case, and that there was no evidence of a 2-1/2 percent commission agreement.

The jury initially returned a verdict in favor of Rhodes, but left the commission amount blank. They were asked to return and complete the verdict, and subsequently returned with a verdict "assess[ing] Plaintiff's damages at 5% of the total." The court then had counsel retire to chambers, where he proposed to again give the jury the foregoing instruction. National agreed to this procedure and the jury was so reinstructed, and then returned a verdict for Rhodes for $59,191.84.

In setting aside the verdict, the trial court took the view that although the written contract had expired, Rhodes had continued to work for National, and therefore there was a presumption that both parties were operating under the terms of the commission contract, citing 53 Am. Jur. 2d *Master and Servant* §§ 23, 31, & 75, and 12 M.J. *Master and Servant* § 7. It was the court's position that Rhodes had attempted to modify the compensation level to which he was entitled under the commission contract, and that his evidence on modification failed to overcome the legal presumption. The court concluded, without elaboration, that the evidence did not

support a finding that there was a "meeting of their minds" as to the commission, and therefore ruled that the case was "tried contrary to the law, and the Jury instructed contrary to the law."

There was some conflict in the evidence as to whether all the sales contracts for the Morlang project were signed in 1968, the year covered by the commission contract. There is no dispute that Rhodes continued in National's employment in 1969 and 1970, and that the Morlang sales were completed during those years. While the trial court was correct in its holding that the law presumes the original agreement continues, it erred in concluding that the record demonstrated that Rhodes had sought to modify the compensation terms of the written contract.

There is no doubt from the record that both parties tried the case on the theory that one of the commission levels contained in the commission contract controlled the amount of commission Rhodes was entitled to receive. National claimed the 1 percent level, since it took the position that the Morlang sales were specially priced and that it could depress Rhodes' commission to 1 percent. Rhodes urged the 5 percent figure, which was his regular commission. There was also some evidence to suggest that this was a builder-dealer project where the 2-1/2 percent commission would apply because of the volume discount. There was, in short, conflicting evidence as to what was the proper commission.

The comprehensive instruction discussed above correctly advised the jury of the various commission levels to which the conflicting evidence related. Indeed, on appeal National states in its brief:

> "All parties agree that the contract was the law of the case and that the Plaintiff's rights were determined by its provisions."

The parties not only urged different compensation levels, but each also presented evidence to attempt to persuade the jury that the other side had orally agreed to

the other's contract level of commission. This evidence of mutual agreement obviously caused the instruction in question to contain language about the parties having "a meeting of their minds and agree[ment]" as to a certain level of commission.

The principal problem in this case was not that the contract language was ambiguous, but rather that the contract contained various levels of commission predicated on the type of sale, and the parties were in disagreement as to the factual character of the underlying sales constituting the Morlang project.

The present case is somewhat analogous to *Nesbitt v. Flaccus*, 149 W. Va. 65, 138 S.E.2d 859 (1964), which presented the question of the compensation due a real estate broker under a sales agreement. There, the question was not whether the contract language was ambiguous, but whether the broker's actions produced the ultimate sale. A subsidiary question was the amount of commission that was due because of a dispute as to the price level upon which the commission was predicated. The factual dispute related to the parties' conduct, which, once resolved, permitted the contract terms to be applied. In *Nesbitt*, we concluded:

> "The question as to whether the plaintiff furnished a purchaser was settled by the jury. In the circumstances of this case and in view of the above authorities, we think that it was proper to allow the jury to decide what, if any, compensation the plaintiff is entitled to recover. To hold otherwise would open the door to the possibility of widespread fraud." [149 W. Va. at 77, 138 S.E.2d at 867]

In the present case, both parties agree that the question of the amount of the commission due Rhodes had to be resolved by determining which of the several commission levels applied to the Morlang sales. The problem is not the ambiguity of the contract language,[4] but an evi-

---

[4]The traditional contract ambiguity case generally involves a situation where the underlying factual conduct of the party is not in dispute and the issue is whether such conduct comes within the

dentiary conflict as to the kind of sale the Morlang transaction constituted, and a further evidentiary conflict as to whether the parties orally agreed on the particular commission level at the time of the Morlang sales. In 3 A. Corbin, *The Law of Contracts* § 554 (1960), at 227, this problem is discussed:

> "Courts often say that when the evidence outside of the written instrument is conflicting, the resulting questions may become 'questions of mixed law and fact.' If the sole question raised by the conflicting evidence is as to the 'interpretation' of language, it is a question of fact with which no question of law is 'mixed.' But the legal operation of words and other symbols is dependent on the interpretation to be given to them; and it is not always easy to separate the two. Not infrequently courts have turned these 'questions of mixed law and fact' over to a jury to be answered by them by a general verdict with instructions as to the possible alternative legal effects."

In contracts which provide for different levels of compensation depending on the particular factual circumstances, the controversy often centers not on the meaning of the contract language, but on the factual conduct of the parties as it relates to one of the contemplated contract levels of compensation. Consequently, where the operative facts are in dispute, it is the jury's task to

---

contract language, which is ambiguous when read in the light of the agreed conduct. *See, e.g., International Nickel Co. v. Commonwealth Gas Corp.,* 152 W. Va. 296, 163 S.E.2d 677 (1968); *Berkeley County Public Service District v. Vitro Corp. of America,* 152 W. Va. 252, 162 S.E.2d 189 (1968); *Cotiga Development Co. v. United. Fuel Gas Co.,* 147 W. Va. 484, 128 S.E.2d 626 (1962); *Utica City National Bank v. Gunn,* 222 N.Y. 204, 118 N.E. 607 (1918) (Cardozo, J.); *see generally* 3 A. Corbin, *Th Law of Contracts* § 554 (1960), at 218-223; J. Calamari & J. Perillo, *The Law of Contracts* §§ 3-8–3-12 (2d ed. 1977). Here, the parties do not contend the contract language is ambiguous. The dispute is over the facts surrounding the Morlang sales. Each party's version of the facts can easily be fitted into a particular contract level of compensation, but the dispute centers on resolving the parties' differing factual versions of what the Morlang sales represent.

resolve the factual dispute in order to determine what contract level of compensation is appropriate. The focus in these cases is not the contract language, but the resolution of the facts to determine which of the alternative levels of compensation is applicable. *See, e.g., Cessna Aircraft Co. v. Aerial Surveys of Pittsburgh, Inc.,* 270 F.2d 206 (10th Cir. 1959); *Cessna Aircraft Co. v. Aviation, Inc.,* 243 F.2d 815 (10th Cir. 1957); *Moossy v. Huckabay Hospital, Inc.,* 283 So.2d 699 (La. 1973).

In the present case, the trial court record demonstrates that the parties tried the case on the theory that the correct commission level was one of the several commission levels set out in the written contract. The trial court was in error when it set aside the jury verdict on the basis that the plaintiff had sought to modify the contract language. There was no attempt on the part of Rhodes to modify the terms of the contract. His position was that the was entitled to the 5 percent commission set forth in the contract. The defendant National disagreed, and claimed the 1 percent commission level applied. The question was properly submitted to the jury, which found for the plaintiff. The law in this area is settled in Syllabus Points 6 and 7 of *Earl T. Browder, Inc. v. County Court,* 145 W. Va. 696, 116 S.E.2d 867 (1960):

> " 'Where, in the trial of an action at law before a jury, the evidence is conflicting, it is the province of the jury to resolve the conflict, and its verdict thereon will not be disturbed unless believed to be plainly wrong.' Point 2, Syllabus, French v. Sinkford, 132 W. Va. 66 [54 S.E.2d 38]."

> "The action of the trial court in setting aside a verdict for the plaintiff and awarding the defendant a new trial will be reversed by this Court where it appears that the case, as a whole, was fairly tried and no error prejudicial to the defendant was committed therein."

*Browder's* result was that the trial court's erroneous action in setting aside the plaintiff's jury verdict was reversed and the jury verdict reinstated. We have

reached a similar result in other cases where the trial court has mistakenly overturned a jury verdict. *Gault v. Monongahela Power Co.*, ____ W. Va. ____, 223 S.E.2d 421 1976); *State Road Commission v. Bowling*, 152 W. Va. 668, 166 S.E.2d 119 (1969); *Bronson v. Riffe*, 148 W. Va. 362, 135 S.E.2d 244 (1964).

Since we find that the case as a whole was fairly tried and that no error prejudicial to the defendant was committed, we reverse the order setting aside the plaintiff's jury verdict.

> *Judgment reversed;*
> *verdict for plaintiff*
> *reinstated; judgment*
> *rendered by this Court.*

McGRAW, JUSTICE, *dissenting:*

This case is an appeal from a final judgment of the Circuit Court of Wood County. The final judgment set aside a jury verdict for the plaintiff and granted a new trial to the defendant. The majority finds the trial court acted incorrectly in setting aside the verdict and granting a new trial; accordingly, they would reverse the judgment below.

I disagree with the result reached by the majority, and I find it necessary to file this dissent.

On December 5, 1975, the jury returned a verdict for the plaintiff and against the defendant of $59,191.84 as to the "seven Morlang projects." This sum is consistent with the following portion of an instruction offered by plaintiff and given by the court:

> On the other hand, if you believe from a preponderance of the evidence that Charles G. Rhodes and the defendant, by an through its employee, L. W. McKenzie, Jr., had a meeting of their minds, and agreed that Charles G. Rhodes was to receive 5% of the net receipts from the Morlang projects, then you should find for the plaintiff, Charles G. Rhodes, upon the issues joined as to the Morlang projects and allow him

$73,990.65 less the sum of $14,798.81, which the defendant has paid to the plaintiff, and return a verdict in favor of the plaintiff and against the defendant in the amount of $59,191.84 as to the Morlang projects.

It is certain that the jury based their verdict on a 5% commission, since this is consistent with the undisputed evidence that the total sale price of the projects was $1,479,813.00.

The defendant's motion to set aside the verdict and grant a new trial was granted. In the memorandum opinion accompanying the judgment order the trial court states:

The case was tried as to the seven Morlang projects, on the theory that the written contract of November 10, 1967, had expired by its own terms on December 31, 1968, and was not in force and effect in 1969 when the Morlang projects were sold, and that the parties had orally negotiated the commission, which the plaintiff was to receive for the Morlang Projects.

The Court then held: "I am of the opinion that the written contract was the contract between the parties, as to the seven Morlang projects, and that the case, as to the seven Morlang projects, was tried contrary to the law, and the Jury instructed contrary to the law."

In reaching this conclusion, the trial court relied upon the following rule of law:

It is the general rule ... that when, upon the expiration of a contract of employment for a definite term, the employee continues to render the same services as he rendered during the term of the contract without explicitly entering into any new agreement, it will be presumed prima facie that he is serving under a new contract having the same terms and conditions as the original one. This presumption applies to both the duration of, and remuneration for, the continued employment. It may be rebutted by evidence showing a change of the terms of the contract, or by

proof of facts and circumstances showing that the parties understood that the terms of the old contract were not to apply to the continued service. 53 Am. Jur.2d *Master and Servant* § 23 at 99 (1970).

It was upon this reasoning and law that the trial court sustained the defendant's motion to set aside the jury verdict and grant a new trial. The general rule relied on is the common law rule adhered to in Virginia. *See, Norfolk Hosiery & Underwear Mills Co. v. Westheimer*, 121 Va. 130, 92 S.E. 922 (1917); 12B M.J. *Master & Servant*, § 7 (1978); 56 C.J.S. *Master & Servant* § 118 (1948).

Although the plaintiff's conduct of the trial was less than lucid, I agree with the trial judge's opinion that the written contract was the contract of the parties because the evidence failed to prove the parties orally agreed to a "new contract" or a modification of the written contract. Accordingly, I agree with the trial judge's finding that the jury was instructed contrary to the law of the case. Furthermore, I believe that even if one were to hold the evidence established an oral modification of the written contract and the case was tried on that theory, the verdict could not stand because the jury was not fully instructed on the theory of an oral agreement modifying the written contract's terms. Plaintiff's instruction did not fully state the law on this point. Specifically, the jury was not instructed as to the general rule of law cited above, and was not told that it is presumed *prima facie* that the terms of the original contract continued until plaintiff met the burden of rebutting that presumption. The defendant was clearly prejudiced because the instructions did not require the jury to find that plaintiff had met the required burden of proof. For these reasons I believe the trial judge was correct in granting the defendant's motion to set aside the verdict and grant a new trial, and I would affirm the judgment below.

"The judgment of a trial court in setting aside a verdict and awarding a new trial is entitled to peculiar

weight and its action in this respect will not be disturbed on appeal unless plainly unwarranted." Syl. pt. 3, *Young v. Duffield*, 152 W. Va. 283, 162 S.E.2d 285 (1968).