[No. 37017.   Department One.   April 30, 1964.]

GLEN TOMPKINS et al., Appellants, v. GAYLE GERING et al., Respondents.*

*Caw & Caw* and *Miller, Jansen & Sackmann,* for appellants.

*Regal & McDonell,* for respondents.

HALE, J.—It was bound to happen sooner or later. We mean, of course, an action by a water skier against the boat driver. The injuries were serious.

This appeal is taken from a judgment entered upon a verdict directed for the defendants. An order striking the affirmative defense of contributory negligence, because of procedural deficiencies, narrows the issues to the question of defendants' negligence. Our chief problem relates to proof concerning the boat driver's negligent acts or omissions.

*Reported in 391 P. (2d) 957.

Gayle Gering, defendant, owned a 16-foot fiberglass Sun City boat, powered by a 50-horsepower Johnson outboard motor equipped with a pulling propeller. On June 16, 1961, he and Glen Tompkins, plaintiff, teamed up to do some water skiing on Moses Lake, using Gering's boat, skis and lines. Both parties had skied together without incident during several previous summers, but this was the first time for the 1961 season.

On this particular day, with defendant Gayle Gering forward in the boat as driver and Barbara Tompkins, plaintiff wife, in the stern to manage the towlines, they set out from shore to pull Tompkins on skis. Concerning his wife's responsibilities in handling the towlines, Tompkins testified:

"Q. When you water ski, is it customary to have two people in the boat? A. You are supposed to have somebody driving the boat and somebody as an outlook. Q. Are there specific duties set out by custom for each person in the boat, or do you know? A. I don't know. Q. On this particular day, what was Barbara doing in the boat? A. She was there to let out the rope and to watch the skier at all times, and then whenever you land, they pull the rope in so it doesn't get wound up in the motor or if you happen to fall, they have to recoil it to let it out again. Q. Was part of her job to watch you as the skier? A. That is their job. Q. And what would the duty of the boat driver be? A. To operate the boat. Q. Does he have any responsibility to watch the skier? A. I would say, no."

With defendant Gayle Gering at the controls and plaintiff on skis, the boat moved straight out from shore toward the center of the lake into a sweeping right turn to the south and, making an oval loop, sailed past the shore. Plaintiff Glen Tompkins said that, as he swept close to the shore, he came near a beached boat and signaled his wife, Barbara, that he wished to go ashore. They made a second sweeping turn out into the lake, came around in a wide curve toward the shore, and, while skimming in for a landing, the accident happened.

Plaintiff Glen Tompkins says that suddenly the towline came slack in his hands, he was jerked out of his skis and

catapulted into the air and then headlong into the shallow water, striking his head on the bottom of the lake. He describes the event in this way:

"A. We made a wide oval loop and came parallel to the shore. We were in kind of a cove that came around the west shore and out to a point, and we came up along, parallel to that. About the time the boat was straight across from the picnic grounds, we turned out toward the center and slack came in the rope and when the slack came out of the rope it jerked me out of the skis and I hit the bottom of the lake."

He ascribes the accident—occasioned by the slack line and the jerk—to defendant driver's negligence while bringing him in for a landing. He says that customarily, in past years, the defendant would swing the boat in toward and run parallel to the shore for a while and then reduce speed to allow the skier to settle gently in the water. This time, he says, contrary to his expectations, the boat at full throttle moved toward the shore at a sharp angle and then made an abrupt right turn toward the center of the lake, thus creating the slack and somehow producing the jerk.

Mr. Tompkins testified on cross-examination that, after signaling his wish to go in to shore, that is to quit skiing, he was at all times free to let go of the towrope and settle down in the water to a gentle stop. He admitted that, during the entire maneuver up to the moment of the accident, he had control over himself and that the boat did not control his actions.

Only one skier qualified to testify as an expert in the case. Mr. Robert Olson, called by the defendants, and having no prior acquaintance with any of the parties, met the requirements of an expert in this sport. For several years he had been a physical education teacher and athletic coach in high school and a water skier since 1957. Since that year, he had skied during six or seven days of the week through the summer months, and occasionally even in the winter time. He had participated in nearly 25 water skiing tournaments in the Pacific Northwest and California and had trained his own children in the sport.

Mr. Olson could see nothing in defendant driver's handling of the boat from which negligence might be inferred. On the question of speed, he said that one can be pulled up onto skis at 15 miles per hour, but that higher speeds are essential to comfortable skiing. Twenty to twenty-five miles per hour would not be—as he put it—excessively low, but higher speeds are recommended, and in tournaments much higher speeds are used. Thus, we have no standard, fixed by the evidence in this case, by which high speed can be said to be an ingredient of negligence.

He then described the three ways in which to produce a slack in the towline—all methods being under the control of the skier except when the boat is throttled down or makes so sharp a turn that it loses its speed and moves on at a slower speed than that of the skier, but he found no way that the sharp turn of the boat at high speed could produce both a slack in the line and a jerk almost immediately thereafter so as to catapult the skier into the air.

Applying his knowledge of skiing to the facts shown at the trial, he said that he found nothing unusual or out of the ordinary in Gering's handling of the boat and could find no maneuvers which would mislead or deceive a skier or put him in trouble. He said that the skier at all times has complete control of his posture and can determine his landing by simply letting go of the towrope and sinking into the water. Nor did the witness find any departure from ordinary boat-handling standards in the angle the boat's course made with the shore line when bringing plaintiff Tompkins in to land.

Plaintiffs supplied the court with no criteria by which negligence, or its absence, may be measured. Other than the mere suggestion that on previous occasions—in other years—defendant driver brought him into shore more or less parallel to it and then throttled down; we have no standard, nor had the jury, by which to determine ordinary care and prudence. For aught we and the jury would know from the evidence, the approach and the turn employed on the day of the accident may have been safer than the

methods of making a landing employed by the parties on previous occasions.

We do not overlook that the trial court struck the affirmative defense of contributory negligence because of some procedural deficiencies.

We agree with the trial court's summary of the evidence as it applied it in this particular instance when, in summarizing the facts, it said:

" . . . the throttling down doesn't mean a thing. He could throttle up or throttle down. Once the skier is brought in, it is up to the skier to let go of the rope, and it is up to the driver of the boat to get out of the way, whether he does it by turning and throttling down or turning and not touching the throttle . . . The main thing is to get out of the way of the skiers so they don't run into the boat."

█ Our review of the principal cases on the subject of water skiing, including the Annotation, 63 A.L.R. (2d) 343; and *Allman v. Bird,* 186 Kan. 802, 353 P. (2d) 216; *Nugen v. Hildebrand,* 145 W. Va. 420, 114 S.E. (2d) 896; and *Kiburz v. Loc-Wood Boat & Motors, Inc.,* 356 S.W. (2d) 882 (Mo.), confirm our opinion that plaintiffs proved no facts from which defendants' negligence could properly be inferred, and the trial court, therefore, correctly directed a verdict for the defendants.

The judgment is affirmed.

OTT, C. J., HILL, ROSELLINI, and HUNTER, JJ., concur.