[Civ. No. 41382. Second Dist., Div. Five. Jan. 24, 1974.]

ANNE PRESS et al., Plaintiffs and Appellants, v.
REID B. LYFORD, Defendant and Respondent.

## COUNSEL

Parker, Milliken, Kohlmeier, Clark & O'Hara and William P. Camusi for Plaintiffs and Appellants.

Hagenbaugh & Murphy and Thomas E. Rubbert for Defendant and Respondent.

## OPINION

**KAUS, P. J.**—Plaintiff[1] and appellant Anne Press was injured when struck by a motorboat operated by defendant and respondent Reid Lyford. Plaintiff appeals from a judgment, after a jury verdict, in favor of defendant, and from the trial court's order denying her motion for judgment n.o.v.

### FACTS

The accident occurred on Lake Arrowhead in August 1968. Defendant was operating his motorboat; his children and some friends were passengers, his son was waterskiing. Plaintiff too was waterskiing, pulled by a friend's motorboat on an easterly course. Defendant first observed plaintiff at a distance of about 1,100 feet. At some point, defendant changed his course so that he was running parallel to and about 150 feet to the right, or south, of plaintiff and the boat towing her. Plaintiff's boat continued to maintain its course. At one point both boats were about even; then plaintiff's boat,

---

[1]The action was originally filed by plaintiff's father, since plaintiff was then a minor.

which was running at about 30 miles per hour, started pulling away from defendant's, which was running at about 28 miles per hour. At about this time, defendant's son fell in the water. Another boat without a skier was about 700 feet behind defendant, running a bit slower than defendant's boat. The Lake Arrowhead rules require that a boat turn to the left in going back to pick up a fallen skier.

Plaintiff was now about even with defendant's boat. She was generally aware of defendant's boat running parallel to her boat until her own boat pulled ahead. Defendant started to make a U-turn at 28 miles per hour. He thought he had plenty of room to make the turn, even if plaintiff fell into the water while he was making it. He had never estimated the turning diameter, but at the trial he concluded that the turn would take up 100 feet. When defendant's boat was at right angles to plaintiff and the boat towing her, he saw her let go of the rope and fall into the water.

Plaintiff let go of her tow because she suddenly got very tired. She supposed that she could have held on for a few seconds longer. She did not signal to the observer in the boat towing her that she was about to let go of the tow.[2] She looked both to the left and the right before she let go of the rope; she did not see any boat around her. She lost both her skis falling into the water. She was wearing a buoyant life jacket which restricted her mobility.

The precise position of defendant's boat with respect to plaintiff when she let go of her tow was disputed. Defendant testified that while he was in the process of making his turn and headed toward plaintiff's path, she "was just a little bit to the left of the bow," suggesting that his boat would have been in her line of vision if, as plaintiff testified, she looked both to the left and to the right.

When defendant saw plaintiff let go of the tow, he immediately pushed the throttle in (off) and turned off the ignition in his engine. He lost steering control; the boat veered off on a tangent and struck plaintiff.

Defendant's boat had an inboard engine with a single-screw propeller. Defendant's expert, Engdahl, explained that when a boat engine is cut off at a fast speed such as 28 miles per hour, the propeller generates turbulence without forward thrust, and the rudder loses control. The boat will go off at an angle: defendant's boat in tests "immediately straightened out and took off on a tangent to the arc that the boat was following as it went

---

[2]There was considerable testimony concerning various signals between a waterskier and the observer in the towing boat. No one established whether there was any standard signal used by a skier to indicate an intention to let go of the ropes.

around the curve." Simply, instead of going left, the boat will go right. As defendant, an engineer, stated: "[C]entrifugal force will have a tendency to straighten it out some. . . ."

However, at the time defendant did not know that the boat would go off at a tangent if the engine was shut off during a high-speed turn. He did not have time to think about things; he wanted to avoid an accident. He had never shut off the engine in the middle of a turn before, and he had never experienced the boat's characteristic "to just go straight" when the engine is abruptly cut in mid-turn. He was about 140 feet from plaintiff when he cut his engine; he later guessed that the boat would coast about 120 feet after cutting the engine from 28 miles per hour.

Engdahl, a mechanical engineer, who was one of two experts who testified on behalf of defendant,[3] had made turn tests. At 28 miles per hour, the turning diameter varied from 100 to 175 feet; however, Engdahl was not as familiar with the boat as defendant who made six to eight test turns at 28 miles per hour within a 125-foot diameter.

Engdahl, as noted, related the effect of abruptly shutting down all power in a motorboat, such as defendant's, while it was in a turn. He also testified that a motorboat operator should keep in mind that a waterskier may go into the water at any time, and should control his boat so that it does not become a hazard if that happens. A boat operator should not execute a turn without knowing the turning characteristics of the boat. He also testified that defendant's action in shutting down the engine was a "normal reaction," because the sheering-off effect "is not the kind of thing that the normal boat driver under normal conditions would encounter very frequently."

Taschner, the present owner of defendant's boat and his other expert, testified that it was not a good practice to make a turn toward a skier if the operator is not certain he can negotiate the turn safely. If the operator is certain of the distance, he should continue his turn. Taschner had made many turns in defendant's boat at 28 miles per hour within a 125-foot turning diameter.

Additional facts will be developed in connection with the plaintiff's contentions.

## CONTENTIONS ON APPEAL

Plaintiff contends: 1. The trial court should have granted plaintiff's motion for judgment notwithstanding the verdict. 2. The trial court er-

[3]The testimony of plaintiff's expert varied in some details from that of defendant's experts.

roneously refused to give the jury a conditional res ipsa loquitur instruction.
3. The trial court erred in instructing the jury on "imminent peril."

### BACKGROUND

Nautical rules of the road, even in a relatively confined area like Lake Arrowhead, tend not to be absolute: "In the case of pedestrians on sidewalks, and even cars and trucks on highways, it is a fairly simple matter to keep clear of approaching danger. Both individuals and vehicles follow well-defined paths or lanes, and by keeping to their right, the danger of collision is nearly eliminated." (Chapman, Piloting, Seamanship and Small Boat Handling (1972) p. 67 [hereinafter "Chapman"]. See generally, Cal. Pleasure Boating Law (Cont. Ed. Bar 1963) p. 97 et seq.)

"Technically, the [nautical] right-of-way rules do not come into effect in a situation between two vessels until the possibility of a collision exists—they are not applicable otherwise." (Chapman, p. 69.) In contrast, vehicle code statutes governing traffic signals, direction, and other matters often apply regardless of the likelihood of a collision.

Although the transcript is replete with reference to various rules governing boat operation and waterskiing on Lake Arrowhead, neither party relies on the violation of any rule. Further, while California has enacted some statutes and regulations regarding both boat operation and waterskiing, none of the statutes or regulations has direct application to this case. (See Harb. & Nav. Code, §§ 650-674; Cal. Admin. Code, tit. 14, §§ 6600-6697.)

Federal statutes provide no additional guidance. (See, e.g., Motorboat Act of 1940, 46 U.S.C. § 526 et seq., Federal Boat Safety Act of 1971, 46 U.S.C. § 1451 wt seq.; 33 C.F.R. § 173.1 et seq.) Thus, our assessment of the conduct of the parties must necessarily be based on such standards as may be reasonably inferred from those nautical and waterskiing rules and regulations that do exist, and, to some extent, on common sense.

A boat operator does not, without more, have a right that others travel in a fixed channel or corridor of water.[4] Nevertheless, within limitations, he does have a right, superior to that of others, to some portion of a corridor of water. For example, navigating a vessel between a towing vessel and its tow is prima facie negligent operation. (Cal. Admin. Code, tit. 14, § 6697, subd. (c).) At Lake Arrowhead, boats must move in a counter-

---

[4]A waterway marking system has been established, but is generally used only in narrow channels. (See, e.g., 33 C.F.R. § 66.10 et seq.; Cal. Admin. Code, tit. 14, § 7000 et seq.; Chapman, *supra,* p. 304 et seq., plates I-L.)

clockwise direction; boats must not follow other boats closer than 200 feet; boats must make a U-turn to the left to pick up fallen waterskiers.[5] Thus, even without fixed buoy-marked channels,[6] a limited right-of-way exists for persons and boats within fictional corridors or channels of water.

One principle of nautical rules is based on the relative maneuverability of two vessels. Thus, when a motorboat and a sailing vessel are sailing on a collision course, the sailing vessel has the right-of-way, unless the movement of the sailing vessel will hamper the safety of a motor vessel in a narrow channel. (E.g., Cal. Admin. Code, tit. 14, § 6621.)

By analogy, a waterskier would generally have the right-of-way over a motorboat. A waterskier in tow is less maneuverable than a motorboat; like a sailing vessel, the skier is dependent for continuing movement on external force. Moreover, the skier is subject to falling into the water, and, once in the water, is relatively immobile.

■ Generally, then, a motorboat with a waterskier in tow, maintaining a fixed course, has the right-of-way over a motorboat planning to cross the "channel" within which the skier is running, which boat is obligated to stay away from that "channel."

### Judgment Notwithstanding the Verdict

■ Plaintiff contends that the trial court should have entered judgment in her favor, because, as a matter of law, defendant was negligent and plaintiff was not.

Plaintiff relies on *Gray* v. *Brinkerhoff*, 41 Cal.2d 180 [258 P.2d 834], and *Novak* v. *Dewar*, 55 Cal.2d 749 [13 Cal.Rptr. 101, 361 P.2d 709], both of which involved pedestrians struck while in marked crosswalks by left-turning vehicles. *Gray* and *Novak* were amplified in *Schmitt* v. *Henderson*, 1 Cal.3d 460 [82 Cal.Rptr. 502, 462 P.2d 30].

Briefly, both *Gray* and *Novak* held that the left-turning motorist was negligent as a matter of law because the failure to yield the right-of-way to a pedestrian in a crosswalk was a violation of the Vehicle Code. (*Gray* v. *Brinkerhoff, supra,* 41 Cal.2d 180, 184; *Novak* v. *Dewar, supra,* 55

---

[5]We can locate nothing in the record to indicate whether the various rules for Lake Arrowhead are local rules, county rules, or rules established by the owners or managers of the lakeshore property.

[6]A buoy-marked area 200 feet from the shore marks a 5-miles-per-hour zone at Lake Arrowhead. The only relevance of the existence of this area was whether plaintiff, if she was getting tired, could have or should have signaled to her tower to head for the five-mile zone, and held on to her rope until she reached safety.

Cal.2d 749, 752.) The court in both cases rejected the asserted contributory negligence of the pedestrian. "[The pedestrian] had no reason to believe that defendant intended to violate her right of way . . . ." (*Gray v. Brinkerhoff, supra,* at p. 185.) "[P]laintiff was entitled to act on the assumption that [the defendant] would not violate her right of way until she actually observed that it was doing so by making a left turn . . . ." (*Novak v. Dewar, supra,* at p. 753.)

In *Schmitt v. Henderson, supra,* 1 Cal.3d 460, 464, the court held further that the plaintiff pedestrian was not required "as an ordinarily prudent person, to look *behind* him for possible danger . . . ." (Italics in original.)

*Contributory Negligence*: None of the three pedestrian cases—*Gray, Novak,* or *Schmitt,* applies here. The evidence in this case was conflicting whether plaintiff could see defendant just before she dropped into the water and whether her view would have made it appear that defendant was about to violate whatever right of way she may have had with respect to the corridor of water in which she was traveling.

Viewing the evidence most favorably to defendant, we cannot hold, as a matter of law, that plaintiff was free from contributory negligence. A waterskier has a duty to keep a proper lookout for her own safety. (*Reddick v. Lindquist* (Tex.Civ.App. 1972) 484 S.W.2d 441, 444.)

Although plaintiff claimed that defendant's boat was behind her and that she looked to both sides before throwing up the tow rope, the jury was not required to believe her. Rather, the jury was entitled to believe that when plaintiff let go of the ropes, defendant's boat was proceeding on the "flat" of the U-turn defendant was making, so that it appeared to be headed toward the channel or corridor in which plaintiff was skiing and that defendant's boat was visible to plaintiff had she turned her head only slightly.[7]

Plaintiff testified she could probably have held on for a few seconds longer, and defendant's expert, Taschner, testified that there "are signals

---

[7]The record concerning the relative positions of the parties just before plaintiff dropped into the water and defendant started his turn is confusing. Obviously the split-second sequence of events and the relative positions of the parties at each precise moment were questions of fact to be resolved by the jury under appropriate instructions. Suffice it to say that even if we resolve all conflicts in the evidence as well as all inferences which the jury could properly draw in defendant's favor, he was obviously flirting with disaster when he started his turn, even though he might have avoided the accident had plaintiff held on to her tow for a few seconds more, or had he not lost steering control by pushing in the throttle and turning off the ignition.

in case a skier gets tired to indicate to their driver that they are getting tired, in which case the best thing is just to shut down the engine."[8] It is by no means clear, however, that the purpose of such signals is to alert anyone except the operator of the boat towing the skier. (*Asplund* v. *Driskell,* 225 Cal.App.2d 705, 716 [37 Cal.Rptr. 652]; cf. *Atkins* v. *Bisigier,* 16 Cal.App.3d 414, 422 [94 Cal.Rptr. 49].)

Be that as it may, we cannot hold, as a matter of law, that plaintiff was not contributorily negligent, even if the evidence on that issue is slight and disputed. At a minimum, there was some evidence that she could have observed defendant's boat, appreciated the danger it represented, and have held on for another second or two.

Defendant's Negligence: Since there was some evidence which justified submitting the issue of plaintiff's contributory negligence to the jury, the trial court's order denying her motion for a judgment n.o.v. was correct and we need not decide whether defendant's negligence was established as a matter of law.

## RES IPSA LOQUITUR

■ Plaintiff contends that the court erred in refusing a conditional res ipsa loquitur instruction. The instruction read:

"On the issue of negligence, one of the questions for you to decide in this case is whether the accident involved occurred under the following conditions:

"First, that it is the kind of accident which ordinarily does not occur in the absence of someone's negligence;

"Second, that it was caused by an agency or instrumentality in the exclusive control of the defendant; and

"Third, that the accident was not due to any voluntary action or contribution on the part of the plaintiff which was the responsible cause of his injury.

"If, and only in the event that you should find all these conditions to exist, you are instructed as follows: (BAJI No. 4.00.)

"From the happening of the accident involved in this case, an inference may be drawn that a proximate cause of the occurrence was some negligent conduct on the part of the defendant.

---

[8]Contrary to Taschner's testimony, there is no standard signal for getting tired. There is, however, a signal to cut the motor (index finger across throat) and a signal to stop (hand up). (Chapman, *supra,* p. 209, fig. 1027 (source: U.S.C.G. Recreational Boating Guide).)

"If you draw such inference of defendant's negligence then, unless there is contrary evidence sufficient to meet or balance it, you will find in accordance with the inference. . . ." (BAJI No. 4.02.)

Defendant contends that the doctrine does not apply at all, because the second and third requirements for the application of the doctrine are not satisfied: The accident was not caused by an instrumentality in the *exclusive control* of defendant, since plaintiff was in the exclusive control of her "instrumentality," that is, the waterskis; and the accident involved the *voluntary action* of the plaintiff in throwing up the tow rope.

Both parties rely on *Shahinian* v. *McCormick,* 59 Cal.2d 554 [30 Cal. Rptr. 521, 381 P.2d 377], which also involved a waterskiing accident.[9]

In *Shahinian,* the plaintiff, a fallen waterskier, was waiting to be picked up by a boat operated by the defendant with the plaintiff's wife as a passenger. The boat approached Shahinian in the water. The sequence of events was unclear: Mrs. Shahinian screamed, the defendant turned sharply right, causing the stern to swing left; Shahinian attempted to dive under the boat; Shahinian was struck by the propeller. (59 Cal.2d at p. 558.) He contended on appeal that the trial court erred in refusing to give the same res ipsa loquitur instruction requested in this case. The Supreme Court agreed: "There is no doubt at all that the first two elements of the doctrine were here shown to exist. It is common knowledge that boats, like automobiles [citation] do not ordinarily run over people when driven in a prudent manner. It is also undisputed that [the defendant] had sole control of the boat at all relevant times here." (59 Cal.2d at p. 559.)

Defendant distinguishes *Shahinian* by pointing out that Shahinian's

---

[9]Excepting the general rule stated in *Reddick* v. *Lindquist, supra,* 484 S.W.2d 441, the few cases involving waterskiing accidents from other jurisdictions, discussed by both parties, really do not contribute to our analysis, because of the various fact situations involved. In *Reddick,* the plaintiff waterskier, crossing the wake of his own tow, fell and was struck by the defendant motorboat operator, who was approaching the skier at right angles. The court held that the issue whether the skier failed to keep a proper lookout was properly a jury question. (484 S.W.2d at pp. 444-445.) *Harrop* v. *Beckman* (1963) 15 Utah 2d 78 [387 P.2d 554], held that the issue whether the defendant, who apparently struck the plaintiff waterskier from behind, was negligent and whether the plaintiff was contributorily negligent were jury questions. *Tompkins* v. *Gering* (1964) 64 Wn.2d 389 [391 P.2d 957, 959], affirmed a judgment in favor of the defendant, towing plaintiff, where plaintiff was injured when the towline suddenly went slack. The court noted that the plaintiff supplied the court with no criteria by which negligence, or its absence, could be measured. *Nugen* v. *Hildebrand* (1960) 145 W.Va. 420 [114 S.E.2d 896, 899-900], held that the defendant boat operator who was following and to the right of plaintiff waterskier and struck the plaintiff when his tow veered sharply, owed plaintiff a duty to exercise care and it was a jury question whether defendant violated that duty.

action was not really "voluntary" since he was already in the water and dove protectively, and, more important perhaps, unlike the victim in *Shahinian,* plaintiff was in exclusive control of an "instrumentality."

With respect to the "voluntariness" of plaintiff's conduct in throwing up the rope, *Shahinian* makes clear that the purpose of the criterion is not to reward determinism and penalize free-will, but rather to eliminate plaintiff's conduct, however triggered, as contributing to the accident: "The fact that plaintiff was not inactive at the time of the accident does not prevent the operation of the doctrine. As Dean Prosser states: 'Allied to the condition of exclusive control in the defendant is that of absence of any action on the part of the plaintiff contributing to the accident. Its purpose, of course, is to eliminate the possibility that it was the plaintiff who was responsible. . . . But the requirement may easily be misunderstood. The plaintiff is seldom entirely static, and it is not necessary that he be completely inactive, but merely that there be evidence removing the inference of his own responsibility. . . .

" '. . . Even where the question of plaintiff's own contribution is left in doubt by conflicting evidence, the principle may still be applied under proper instructions to the jury.' (Prosser, Torts (2d ed. 1955) § 42, pp. 208-209.)" (*Shahinian* v. *McCormick, supra,* 59 Cal.2d at p. 560.)

Certainly at the point that plaintiff was in the water, the facts are even stronger than those in *Shahinian,* in which there was some question whether the victim caused his injuries by diving under the boat. Once plaintiff was in the water, she did nothing

Defendant nonetheless asserts that the proper analogy to be applied is that of auto collision cases because essential to the chain of events was plaintiff's *exclusive control* of the waterskis. In *Cordova* v. *Ford,* 246 Cal.App.2d 180 [54 Cal.Rptr. 508], which involved a two-car intersection collision, the court held that the doctrine did not apply, because each party was in control of his own vehicle and each participated in the events that resulted in the accident. (246 Cal.App.2d at pp. 186-187.) The court pointed out that the problem in such collision cases is determining which of the parties was negligent. (*Id.* at p. 186.)

Relying on *Cordova,* the same court held in *Anderson* v. *Jones,* 266 Cal.App.2d 284, 289 [72 Cal.Rptr. 187], that the doctrine did not apply, where the defendant, driving on a freeway median to avoid hitting a stalled car, struck the plaintiff running up the freeway median to get assistance: "[P]laintiff, in running down the median strip, was in exclusive control of the path he chose to follow and free to determine whether there were

hazards in pursuing it." Finally, in *Duncan* v. *Queen of Angels Hosp.*, 11 Cal.App.3d 665, 667, 670 [90 Cal.Rptr. 157], the court held that the doctrine did not apply where the plaintiff, on foot, collided at an intersection of two halls with the defendant, pulling a hospital gurney; since the plaintiff "was in exclusive control of her actions as a pedestrian the requisite exclusive control in defendant did not exist."

However, the real issue is not "exclusive control," but that in such situations, right-of-way cannot be clearly established. (Compare *Tobler* v. *Chapman*, 31 Cal.App.3d 568 [107 Cal.Rptr. 614], in which the doctrine applied where plaintiff's automobile, lawfully in a southbound lane was struck by defendant's northbound vehicle.)

■ Thus, the rule quoted in *Anderson* that covers such situations is simple: The doctrine of res ipsa loquitur does not apply where both parties are "in the exercise of an equal right and each chargeable with the same degree of care." (*Sauer* v. *Eagle Brewing Co.*, 3 Cal.App. 127, 132 [84 P. 425].)

■ But plaintiff and defendant in this case were not "in the exercise of an equal right. . . ." Plaintiff had a right to be in the water corridor or channel where she was at the time that defendant started his turn and at the time he lost control. Whether plaintiff was on skis or in the water is irrelevant; waterskiing necessarily involves falling or jumping into the water, and defendant's suggestions that plaintiff had no more right to let go and become immobile than a passenger in a moving car has to open the door and jump out distorts the nature of the activity. Of course, plaintiff's right of way was not absolute. (See, e.g., *Schmitt* v. *Henderson*, *supra*, 1 Cal.3d 460.) However, that the precise perimeters of plaintiff's right of way must remain undefined does not alter the conclusion that defendant had a duty not to cross her path.

The trial court erred in refusing to give the requested instruction.

## Imminent Peril

■ Plaintiff contends that the trial court erred in instructing the jury on "imminent peril": "A person who, without negligence on his part, is *suddenly and unexpectedly confronted with a peril* arising from either the actual presence of, or the appearance of, imminent danger to himself or to others, is not expected or required to use the same judgment and prudence that is required of him in the exercise of ordinary care in calmer and more deliberate moments. . . ." (BAJI No. 4.40. Italics added.) The instruction should not have been given. Defendant's contention that he

was faced with peril because both plaintiff and his son were in the water is without merit.

"[Defendant's] own testimony . . . makes manifest that [he] was not confronted by a *sudden and unexpected peril.*" (*Kuist* v. *Curran,* 116 Cal. App.2d 404, 410 [253 P.2d 281].) (Italics in original.) Defendant testified that he had been using the motorboat on Lake Arrowhead from May 1964 to the time of the accident in August 1968. He used the boat for waterskiing. He knew that waterskiers fall or jump off. Defendant's expert, Engdahl, testified that there was nothing unusual about a waterskier falling into the water. The boat which concerned defendant was 700 feet behind and going slower than defendant's boat. Plaintiff was on a parallel path 150 feet away. To argue that unexpected peril exists in these circumstances would convert the sport of waterskiing into a hazardous activity and encourage irresponsible conduct by operators of motorboats. That cannot be the rule. The instruction was improper.

The order denying a judgment notwithstanding the verdict is affirmed. The judgment is reversed.

Stephens, J., and Ashby, J., concurred.

A petition for a rehearing was denied February 14, 1974, and respondent's petition for a hearing by the Supreme Court was denied March 27, 1974.